WISE, Presiding Judge.
The appellant, Oscar Roy Doster, was convicted of three counts of capital murder for murdering Paul LeMaster during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975; during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975; and for causing LeMaster’s death by firing a shot from outside a dwelling into a dwelling, see § 13A-5-40(a)(16), Ala.Code 1975.[1] The jury unanimously recommended that Doster be sentenced to life imprisonment without the possibility of parole. The circuit court chose not to follow the jury’s recommendation and sentenced Doster to death. This appeal followed.
The State’s evidence tended to show that on November 6, 2002, Jason Pettie, arrived at his trailer in the Whispering *63 Pines Trailer Park and discovered that his trailer had been ransacked and that several of his guns — a 12-gauge shotgun, a 16-gauge shotgun, and a 30-06 rifle — were missing. Another trailer that belonged to LeMaster was parked about 100 yards from Pettie’s trailer. Pettie noticed that LeMaster’s truck was gone and that the lights were on in his trailer. When police responded to Pettie’s 911 call, he told them about LeMaster’s trailer. Pettie also testified that he was a friend of Doster’s brother and that on one occasion Doster had been to his trailer with his brother.
Police discovered LeMaster’s body in his trailer. He had been shot once in the back. The coroner testified that LeMaster died of a gunshot wound that entered his left lung and tore an artery. Twenty feet from the door of LeMaster’s trailer police discovered a bag of items that were later identified as having been taken from the VFW Post in Covington County.
Elliott King of the Covington County Sheriffs Department testified that on November 4, 2002, Doster and three other inmates — Bobby O’Lee Phillips, Michael Barbaree, and Charles Meeks — escaped from the Covington County jail through the ventilation system and used a mattress to climb a wire fence. The four split up, but Doster and Phillips remained together.[2] Doster and Phillips went on foot to the VFW Post off Covington County Road 70.
Beverly Edwards, an employee of the VFW Post testified that on November 5, 2002, she received a telephone call that someone had broken into the Post. When she arrived she discovered that alcohol, cigarettes, Alka-seltzer brand antacid tablets, drinks, and snack foods were missing. Edwards also testified that the vending and game machines had been opened and that money was missing from the machines. A boat, that was lying near the front of the club, was also taken.
Doster and Phillips used the boat to travel down river, where they stopped near the Whispering Pines Trailer Park— an isolated trailer park that included only two trailers. The two broke into Pettie’s trailer through the back door. They cleaned themselves up, ate, slept, and obtained clothes. The two discussed obtaining some form of transportation. They noticed that a truck was parked in front of the other trailer. Using a rifle and ammunition taken from Pettie’s trailer, Phillips shot LeMaster while LeMaster was in his trailer cooking dinner. Doster and Phillips then entered LeMaster’s trailer and took coins and the keys to LeMaster’s truck.
The two traveled to Mississippi, Louisiana, and Texas, and stayed in various hotels, painted the stolen truck, and returned to Covington County on November 10; they went to a wooded area off Pete McGee Road and emptied the contents of LeMaster’s truck. Some of the items included identification cards in the name of Paul LeMaster.
On November 11, 2002, Doster and Phillips broke into the Florala City Yard. Larry Jackson, an employee of the Florala City Maintenance Shop, testified that on November 11, 2002, the business was broken into and various tools, a gasoline can, and a crowbar were missing. He also said that gas had been siphoned out of several dump trucks. Jackson further testified *64 that Doster had worked at the shop when he was on work release.
Doster and Phillips then broke into the Florala High School on November 12, 2002. Terry Holley, the principal of Flora-la High School, testified that on November 12, 2002, the school was broken into and that approximately $300 was taken out of some vending machines.
Jeremy Douglas, of the Crenshaw County Sheriffs Office, testified that on November 14, 2002, he was in Lockhart making a routine traffic stop when Austin Shoaf approached him and informed him that he had found some documents when he was out hunting — a driver’s license and a 110 Brotherhood union identification card. The name on the documents was Paul LeMaster. Douglas said that he gave the items to Investigator Walter Inabinett of the Covington County Sheriffs Office.
Randall Jackson, the pastor at Conecuh River Baptist Church, testified that on November 17, 2002, someone broke into the church, that the pulpit area was “trashed pretty well,” and that the vending machines had also been broken into. (R. 1892.) Doster was familiar with the church, which his mother-in-law and sons attended.
James Garner, the principal at Pleasant High School in Compton, testified that on November 17, 2002, the school was broken into and that money was taken out of the vending machines.
John Windom, a detective with the Baton Rouge, Louisiana, Police Department, testified that the Remington rifle used to kill LeMaster was recovered from Cash America Pawn Shop in Baton Rouge. Jay East, an employee of the pawnshop, testified that the gun was pawned on November 13, 2002, by an individual named Way-Ion Leach.
On November 18, 2002, Texas State Troopers arrested Doster and Phillips on Interstate 10 near Sonora, Texas, bringing to an end their two-week crime spree. Phillips was driving LeMaster’s truck, and Doster was in the passenger seat. Both Doster and Phillips were advised of their Miranda[3] rights and were taken to the Crockett County jail. Doster made statements to law-enforcement personnel on November 18, 19, 20, and 21, 2002. It was not until the last statement that Doster admitted that he was present when Phillips shot LeMaster.
In Doster’s November 18, 2002, statement, he said that he escaped from the Covington County jail and that he and Phillips went to Pettie’s trailer because he thought that his brother still lived with Pettie. He said that they took clothes and that he left a note saying that he would pay Pettie back when he had the money. As he was walking away from the area, he said, Phillips drove up to him in a brown truck and he got in the truck with Phillips. Doster said that he did not know until they reached Louisiana that Phillips had killed anyone. In this statement, Doster denied any involvement in the burglary of the VFW Post.
On November 19, 2002, Doster again said that he did not know that Phillips had killed LeMaster until he and Phillips were in Louisiana. He also denied any involvement in any of the burglaries.
On November 20, 2002, Doster admitted that he was involved in the string of burglaries set out above. He said that he and Phillips first went to Pettie’s trailer and cleaned up and got clothes. Doster said that when they left Covington County they went to Mississippi, Louisiana, and Texas. He said that to lure Phillips back to Cov- *65 ington County he told Phillips that there was money in Covington County and that he knew a man who carried $20,000 and that they should just kill him and take his money.
On November 21, 2002, Doster admitted that he was present when Phillips shot LeMaster. Doster’s statement read:
“On Monday night after the escape, me and Bobby went to a mobile home that belongs to Jason Pett[ie].... We went in and ate and got dry. We changed clothes. We went to sleep and the next morning we got up and we took a shower and while I was in the shower, Bobby popped the lock on the top of the gun cabinet.... Bobby wanted a gun in case we needed to use it for anything. Bobby had all of the guns laying in the floor. I put all of them back up. Bobby had a 16 gauge in his hand. I loaded a 12 gauge shotgun and slept with it by the door. I also loaded a 22 rifle with one bullet in it. We sat there that whole day and Bobby was always carrying the gun. We were going to leave after it got dark. I went ahead and took another shower and when I was getting in the shower Bobby said that he was going to go kill the son of a bitch and get his truck. Bobby was referring to the man that was living in a trailer near Jason’s house. His trailer was about 100 yards away. We had seen the man come and go and knew he had a pickup. Bobby had a 30.06 in his hand and I was in Jason’s master bath and took a bath. I got out of the bath and when I got out of the bath, Bobby came through the door and he was holding the rifle and Bobby said that the man would never get in his damn cross hairs. Bobby was smiling when he said this. I told Bobby to quit f— around and for us to go on and get the hell out of here and get a way of going. Bobby said to hurry up and get dressed. I was putting on my socks and I had not noticed that Bobby had gone back out the door and the next thing I know I heard a gun-shot and I jumped up running and looked out the front window and I saw the man falling to the ground. The man was in his trailer where the door was. Bobby was outside about 100 yards from the trailer. The shot came from the end of Jason’s trailer. Bobby came running inside and he had the rifle and pointed the gun sort of towards me and said let’s go, get the duffle bag, let’s go. We then went out of the door and ran to the man’s truck. Bobby ran inside the man’s trailer and he asked me to help him find the keys. We both went in and I saw a hamburger cooking on the stove and I turned off the gas. Bobby found a drawer full of coins and he pulled it out and all. Bobby said that the keys had to be in the man’s pocket. I told him that we didn’t have time for this and we needed to get the hell out of here. Bobby wouldn’t let me out of the door and I tried to go out the other door and he told me not to leave that way. Bobby was cutting the man’s pockets with a pocket knife and he was looking for the keys to the truck. It was like it didn’t even phase him. The man was on his back kind of on a sitting position near some stairs that lead to his bed. The man was wearing blue jeans, he had grey hair with a thick moustache. I saw some blood on the floor under him. Bobby still had the rifle and I tried to barge my way out the door and Bobby lifted the rifle up and said hold on just a minute and I said f— this shit man, let’s get the hell out of here. Bobby didn’t say nothing else and I barged my way through the damn door. I went outside and I throwed a dove bucket in the back of the truck and the drawer of change. I started walking around to the passenger side and Bobby said, hell no *66 m — f—, I killed this son of a bitch and you are fixing to drive us out of here because I don’t know where I am at. We just left. The rest of what we did I have already told the investigators from Covington County. When we were driving away from the trailer Bobby told me that the gun had jammed and that the rifle had the empty casing in it. I know that I threw two shells behind the pickup seat and one was good and one was spent. We threw these out on the side of the road when we were clearing it out.
“I want to say that the reason I didn’t tell the truth from the very beginning is because I was scared. I want to say that I am sorry for hurting anybody and I wish I could take it back but I can’t.”
The jury convicted Doster of three counts of capital murder. A separate sentencing hearing was held before the same jury. The jury unanimously recommended that Doster be sentenced to life imprisonment without the possibility of parole. The circuit court chose to disregard the jury’s recommendation and sentenced Doster to death. This appeal followed. See § 13A-5-53, Ala.Code 1975.

Standard of Review

Doster has been sentenced to death. According to Rule 45A, Ala. RApp. P., this Court must review the lower court proceedings for plain error. Rule 45A, Ala. RApp. P., states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). “ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” ’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)).” Ex parte Brown, 11 So.3d 933, 938 (Ala.2008).
“ ‘ “ ‘Plain error’ arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.” ’ Ex parte Womack, 435 So.2d 766, 769 (Ala.1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981)). See also Ex paHe Woodall, 730 So.2d 652 (Ala.1998). ‘ “In other words, the plain-error exception to the contemporaneous objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” ’ Ex parte Land, 678 So.2d 224, 232 (Ala.1996) (quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982))). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). This Court may take appropriate action when the error ‘has or probably has adversely affected the substantial rights of the appellant.’ *67 Rule 45A, Ala. R.App. P. ‘[A] failure to object at trial, while not precluding our review, will weigh against any claim of prejudice.’ Ex parte Woodall, 730 So.2d at 657 (citing Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991)).”
Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002).
With these principles in mind, we review the issues raised by Doster on appeal.

Guilt-Phase Issues

I.
Doster argues that the circuit court erred in failing to remove prospective jurors A.B., J.T., and T.O. for cause, because, he said, they had potential biases against him.[4]
For the following reasons we find that the circuit court committed no error in failing to remove the challenged jurors for cause. Section 12-16-150, Ala.Code 1975, states that the following grounds are sufficient to challenge a juror for cause:
“(1) That the person has not been a resident householder or freeholder of the county for the last preceding six months.
“(2) That he is not a citizen of Alabama.
“(3) That he has been indicted within the last 12 months for felony or an offense of the same character as that with which the defendant is charged.
“(4) That he is connected by consanguinity within the ninth degree, or by affinity within the fifth degree, computed according to the rules of the civil law, either with the defendant or with the prosecutor or the person alleged to be injured.
“(5) That he has been convicted of a felony.
“(6) That he has an interest in the conviction or acquittal of the defendant or has made any promise or given any assurance that he will convict or acquit the defendant.
“(7) That he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict.
“(8) That he is under 19 years of age.
“(9) That he is of unsound mind.
“(10) That he is a witness for the other party....”
Alabama has also recognized that there may be a common-law basis for removing a juror for cause. Hutchins v. DCH Reg’l Med. Ctr., 770 So.2d 49 (Ala.2000).
“In addition to the statutory grounds, there are other common-law grounds for challenging veniremembers for cause where those grounds are not inconsistent with the statute. Smith v. State, [Ms. CR-97-1258, December 22, 2000] — So.3d - (Ala.Crim.App.2000), aff'd in pertinent part, rev’d in part, [Ms. 1010267, March 14, 2003] — So.3d - (Ala.2003); Kinder v. State, 515 So.2d 55, 60 (Ala.Crim.App.1986). Here, we are dealing with the common-law ground for challenge of suspicion of bias or partiality. See discussion of the common-law grounds for challenge in Tomlin v. State, 909 So.2d 213 (Ala.Crim.App.2002), remanded for resentencing, 909 So.2d 283 (Ala.2003). Ultimately, the test to be applied is whether the veniremember can set aside his or her opinions, prejudices, or biases, and try the case fairly and impartially, according to the law and the evidence. Smith v. State, supra.”
McGowan v. State, 990 So.2d 931, 951 (Ala.Crim.App.2003).
*68 As the Alabama Supreme Court stated in Ex parte Burgess, 827 So.2d 193 (Ala.2000):
“The test for deciding a challenge for cause is whether the juror can ignore his preconceived ideas and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror ‘need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.’ Kinder v. State, 515 So.2d 55, 61 (Ala.Crim.App.1986). For a juror to be disqualified, the juror’s opinion of the defendant’s guilt or innocence ‘must be so fixed that it would bias the verdict a juror would be required to render.’ Oryang v. State, 642 So.2d 979, 987 (Ala.Crim.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Crim.App.1989)) (emphasis added). See also § 12-16-150, Ala.Code 1975.
“This Court has recognized that
“ ‘[o]nce a juror makes an initial statement that is vague, ambiguous, equivocal, uncertain, or unclear or that shows confusion, it is the trial judge’s function to question the juror further, so as to ascertain whether the juror can be impartial.’
“Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). ‘The qualification of prospective jurors rests within the sound discretion of the trial judge.’ Morrison v. State, 601 So.2d 165, 168 (Ala.Crim.App.1992); Ex parte Cochran, 500 So.2d 1179, 1183 (Ala.1985). This Court will not disturb the trial court’s decision ‘unless there is a clear showing of an abuse of discretion.’ Ex parte Rutledge, 523 So.2d 1118, 1120 (Ala.1988). ‘This court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised.’ Knop, 561 So.2d at 232. We must consider the entire voir dire examination of the juror ‘in full context and as a whole.’ Ex parte Beam, 512 So.2d 723, 724 (Ala.1987); Ex parte Rutledge, 523 So.2d at 1120.”
827 So.2d at 197-98.
“Even though a prospective juror may initially admit to a potential for bias, the trial court’s denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law.”
Ex parte Land, 678 So.2d 224, 240 (Ala.1996).
A.
Doster moved that the circuit court remove juror A.B. for cause because, he said, she knew a lot of Doster’s relatives and she also knew a member of the district attorney’s office through her position as a child-support worker.
The record shows that the following discussion occurred during the voir dire of A.B.:
“The Court: Do you have any knowledge of any of those individuals or of the Doster family that would in some fashion tend to affect your judgment in this case so that you could not be fair and impartial and render a verdict based solely on the evidence and the law that [you] hear in the courtroom?
“Juror [A.B.]: No, sir.
“The Court: In other words, in my household, you know, sometimes there will be a family that we had such extensive contact with that we feel like we know all their characteristics just by their last name, you know.
*69 “So, you know, somebody did so and so and somebody might say, well, they are a so and so, they are a Johnson, you know, what do you expect. You know?
“So, what I’m asking you is: Do you have any of those kinds of feelings about Mr. Doster?
“I don’t know if the information you have about his family is good, bad, or indifferent. But if you have any feelings like that that would prevent you from being fair and impartial to both sides in this case, the State and the defense, we need to know that now.
“Juror [A.B.]: No, sir. In the job that I do, cases are divided by the last name of the parties. And it just so happens I don’t have the D’s. But I do know those names. And I do know associations of people with the names.
“The Court: All right. Any further questions, gentlemen?
“[Defense counsel]: Yes, sir. Do you work very much with Mr. Enzor?
“Juror [A.B.]: Yes, I do.
“[Defense counsel]: Isn’t Mr. Enzor a part-time prosecutor for the D.A.?
“[Prosecutor]: Yes. He is. But he does that role as an employee of the attorney general’s office. It is completely separate from our office.
“The Court: Anything else, gentlemen?
“[Defense counsel]: No, sir.
“The Court: Would the fact that an attorney who represents the Department of Human Resources here in Cov-ington County worked also part time •with the district attorney’s office tend to influence you in any way in this case?
“Juror [A.B.]: No, sir.”
(R. 1382-84.)
“1 “[T]he mere fact that a prospective juror is personally acquainted with the victim [or his family] does not automatically disqualify a person from sitting on a criminal jury.” Brownlee v. State, 545 So.2d 151, 164 (Ala.Cr.App.1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).... Instead, the test is “whether the [prospective] juror’s acquaintance with [the victim] or relative is such that it would result in probable prejudice.” Vaughn v. Griffith, 565 So.2d 75, 77 (Ala.1990), cert. denied, 498 U.S. 1097, 111 S.Ct. 987, 112 L.Ed.2d 1072 (1991).’
“Morrison v. State, 601 So.2d 165, 168 (Ala.Cr.App.1992) (citations omitted). Because a veniremember’s mere acquaintance with a victim or a family member of a victim is not sufficient to justify a strike for cause, the trial judge did not err when it denied Taylor’s motion. There is no error here.”
Belisle v. State, 11 So.3d 256, 287 (Ala.Crim.App.2007). As this Court stated in Dunning v. State, 659 So.2d 995 (Ala.Crim.App.1994):
“One veniremember had been employed as a maid by the victim’s family and the other stated that she knew the victim’s family. Marshall [v. State], 598 So.2d [14] 16 [ (Ala.Crim.App.1991) ]. This court held that this relationship was not grounds for a challenge for cause as long as the juror indicates that he or she can be fair and impartial. 598 So.2d at 16.”
659 So.2d at 997.
Here, Juror A.B. unequivocally stated that her connection with the people involved in the case would have no impact on her verdict. The circuit court correctly denied Doster’s motion to remove A.B. for cause.
B.
Doster moved to remove J.T. for cause because, he said, he was familiar *70 ■with the facts of the case and answered during voir dire that he kept up with the case because he was a principal at a school in a nearby town. The following occurred during the voir dire examination of juror J.T.:
“The Court: Right. Now, what I need to know is: These things you might have heard — and let me explain this first — these things that you might have heard before you got to court are not things upon which you or I may base a judgment under our laws.
“It is assumed to be unfair to do so because reports that we read in the paper or hear on the media tend to be fraught with error.
“And so, you know, we don’t want to judge somebody’s guilt or innocence based on reports we hear in the news media because there is just too much chance it would be all wrong. Do you agree with that?
“Juror [J.T.]: I agree with it. But at the same time you make an assumption that if the reports are out there that something like that is going on, you make the assumption then to be aware of it and take the action you need to take.
“And when you read about or the speculation is there about what’s going on, you make the assumption that it is going on as it is reported.
“If I’m guilty of anything I guess it’s making assumptions that things are as they appear to be.
“The Court: And I take it — and you correct me if I’m wrong. I take it you are telling me that because you are telling me why you acted the way you did as a principal because you were making assumptions at the time.
“Juror [J.T.]: Right.
“The Court: All right. Now, first of all, I need to know whether or not those assumptions would carry over into this trial or whether or not you would be able to set those assumptions aside and listen to the evidence that you hear and the law that I give you and make a judgment based on the evidence and the law without any assumption. Could you do that?
“Juror [J.T.]: I think I can. I mean, I brought the assumptions with me today, but I also know that a person is innocent until proven guilty. I think I can be objective. I have no reason not to be objective.
“The Court: All right. And I don’t mean to pick at you about this but I have to be sort of precise. If you brought them here with you today, can you throw them down before you get on the jury? That’s what I’m asking you.
“Juror [J.T.]: I think I can.
“The Court: Now, going back to what I said about not relying on hearsay reports, you know, and things that we hear that aren’t in the courtroom. In other words, not relying on things that come to us before trial outside the courtroom.
What I need to know, really, is can you take those things that you heard before you got here to court and put them in a category in your thinking and label that category not evidence or no evidence and sort of push them to the side and then walk in there and listen to the evidence in the courtroom and the law that I give you and fairly and impartially render a judgment based on what you hear in the courtroom and the law I give you and not on any of this stuff you have already heard. Are you able to do that?
“Juror [J.T.]: Well, I want to say no. But, yes. I can. I know you have got *71 to do the right thing. You have got to do your job. And I understand that.
“The Court: Well, why do you want to say no?
“Juror [J.T.]: Well, like I told you this morning, I feel like I need to be at work.
“The Court: So if you said no, it would not be true, is that what you are telling me?
“Juror [J.T.]: Yes, sir.
“The Court: Then I’m going to put it to you one time real direct: Can you fairly and impartially sit as a juror in this case and base your verdict solely on the evidence you hear in the case and the law that I give to you and on nothing else?
“Juror [J.T.]: All right.
[[Image here]]
“[Defense counsel]: Now, Mr. Doster is on trial here — or we are trying to select a jury to try Mr. Doster in a capital murder case for which the death penalty is possible. Can you sit there and unequivocally tell His Honor that you can put all that outside your mind, or would some of that impression and some of that information still linger?
“Juror [J.T.]: No, sir. I truthfully answered Judge McKathan. And, yes, sir. I can take what is before me and make a decision based on that.”
(R. 1155-61.)
“[T]he test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law.” Ex parte Davis, 718 So.2d 1166, 1171 (Ala.1998). “A trial judge’s finding on whether or not a particular juror is biased ‘is based upon determinations of demeanor and credibility that are peculiarly within a trial judge’s province.’ ” Martin v. State, 548 So.2d 488, 490 (Ala.Crim.App.1988).
Prospective juror J.T. unequivocally answered that he could base his decision on the evidence presented and that he could set aside his knowledge of the case gained outside the courtroom and be impartial. The circuit court committed no error in denying Doster’s motion to remove J.T. for cause.
C.
Doster argues that the circuit court erred in failing to sua sponte remove juror T.O. for cause because, he said, she indicated during voir dire that she had learned from media coverage of the case that Doster had also been charged with killing a man in Texas.
As Doster states in his brief, this juror clearly stated that she could render an impartial decision. Thus, there was no reason to remove this juror for cause. “The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).” Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985). See also Neal v. State, 731 So.2d 609, 613 (Ala.Crim.App.1997). “Even though a prospective juror may initially admit to a potential for bias, ... denial of a motion to strike ... will not be considered error ... if, upon further questioning, it is ultimately determined that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law.” Ex parte Land, 678 So.2d 224, 240 (Ala.1996). Juror T.O. stated that she could be impartial. Accordingly, the circuit court did not err in failing to sua sponte remove juror T.O. for cause.
Moreover, the record also shows that neither A.B. nor J.T. served on Doster’s jury and that they were removed by the defense’s use of two of its peremptory strikes. Thus, any error in not re *72 moving these two jurors for cause was harmless. As we stated in Calhoun v. State, 932 So.2d 923 (Ala.Crim.App.2005):
“The Alabama Supreme Court in Bethea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala.2002), returned to the harmless-error analysis when reviewing a circuit court’s refusal to remove a prospective juror for cause. The Supreme Court stated:
“ ‘The application of a “harmless-error” analysis to a trial court’s refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
“ ‘ “The appellant was convicted of the crime of murder in the second degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the jury was formed the defendant had not exhausted his right to peremptory challenges.”
“ ‘Turner v. State, 160 Ala. 55, 57, 49 So. 304, 305 (1909). However, in Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that “[t]he denial or impairment of the right is reversible error without a showing of prejudice.” (Emphasis added [in Bethea].) Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning. See Dixon v. Hardey, 591 So.2d 3 (Ala.1991); Knop v. McCain, 561 So.2d 229 (Ala.1989); Ex parte Rutledge, 523 So.2d 1118 (Ala.1988); Ex parte Beam, 512 So.2d 723 (Ala.1987); Uptain v. State, 534 So.2d 686, 688 (Ala.Crim.App.1988) (quoting Swain and citing Beam and Rutledge); Mason v. State 536 So.2d 127, 129 (Ala.Crim.App.1988) (quoting Uptain).
“ ‘... [T]his Court has returned to the “harmless-error” analysis articulated in the Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and [United States v.] Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an “impartial” jury, see Ala. Const.1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.
“ ‘In this instance, even if the Be-theas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis.’
“833 So.2d at 6-7 (footnotes omitted). See also Dailey v. State, 828 So.2d 340 (Ala.2001). As was the case in Bethea, Calhoun offers no evidence that the jury ultimately impaneled was biased; therefore, if error occurred it was harmless.”
932 So.2d at 944-45 (footnote omitted). Cf. Ex parte Colby, 41 So.3d 1 (Ala.2009); General Motors Corp. v. Jernigan, 883 So.2d 646 (Ala.2003) (harmless-error analysis does not apply when the circuit court *73 erroneously denies challenges for cause of multiple jurors).
II.
Doster next argues that the prosecutor violated the United States Supreme Court’s decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using his peremptory strikes to remove three black prospective jurors from the venire.
In Batson, the United States Supreme Court held that it was a violation of the Equal Protection Clause of the United States Constitution to remove black jurors from a black defendant’s trial based solely on their race. This holding was extended to white defendants, Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to defense counsel in criminal cases, Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); and to gender strikes, J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
“ ‘After a prima facie case is established,[5] there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiserimina-tory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause. Ex parte Jackson, [516 So.2d 768 (Ala.1986) ].’
“Ex parte Branch, 526 So.2d 609, 623 (Ala.1987).
“ “Within the context of Batson, a “race-neutral” explanation “means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.” Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). “In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.” Id. “[E]valuation of the prosecutor’s state of mind based on demeanor and credibility lies ‘peculiarly within the trial judges’s province.’ ” Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869.’ ”
Martin v. State, 62 So.3d 1050, 1058-59 (Ala.Crim.App.2010), quoting in part Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App.1994).
“When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.” Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App.2001). “A trial court is in a far better position than a reviewing court to rule on issues of credibility. Woods v. State, 789 So.2d 896, 915 (Ala.Crim.App.1999). “Great confidence is placed in our trial judges in the *74 selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.” Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).
“Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will ‘largely turn on evaluation of credibility.’ 476 U.S., at 98, n. 21. In the typical challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor’s state of mind based on demeanor and credibility lie ‘peculiarly within a trial judge’s province.’ Wainwright v. Witt, 469 U.S. 412, 428 (1985), citing Patton v. Yount, 467 U.S. 1025, 1038 (1984).”
Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
Here, after the jury had been chosen both the prosecutor and defense counsel announced that they were satisfied with the jury. The circuit court asked the circuit clerk how many African-Americans were on the venire when the attorneys began exercising their peremptory strikes. The clerk responded that five black jurors were on the venire, that one black juror was serving on Doster’s jury, and that the State struck three black prospective jurors. The court then asked the State to explain its reasons for removing the three jurors.[6]
A.
The prosecutor said that he struck juror F.C. because, he said, she indicated during voir dire that she had two relatives who worked for the Department of Corrections. The prosecutor explained:
“We intended to remove anybody who had any connection with the department of corrections because of the nature of this case involving an escape from the county jail, and we were afraid that somebody who had any knowledge of the department of corrections might be critical or overly critical of the way the Covington County jail may have been run.
“And we think there is also a possibility that the defense, especially in some of Mr. Doster’s statements may attack the Covington County jail and the way it was maintained and operated. And for that purpose she was removed.
“I believe the other jurors who indicated they had any connection with the department of corrections were removed by the defense or by the State. In other words, it was equally applied all the way throughout.
“The Court: Okay. There were others who indicated they had some connection?
“[Prosecutor]: Yes, sir. I believe so.
“The Court: And they have all been removed?
“[Prosecutor]: Yes, sir.”
(R. 1416-17.)
“Where the prosecutor is required to explain his peremptory strikes, he must offer ‘a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is *75 nondiscriminatory. Batson, 476 U.S. at 97. However, this showing need not rise to the level of a challenge for cause.’ ” McLeod v. State, 581 So.2d 1144, 1155 (Ala.Crim.App.1990). We have upheld a prosecutor’s strikes that were based on the prospective juror’s connection to law enforcement personnel. See Clark v. State, 621 So.2d 309, 314 (Ala.Crim.App.1992). “Once the responding party has articulated a race-neutral reason or explanation for eliminating the challenged jurors, the moving party can offer evidence showing that the reason or explanation is merely a sham or pretext.” Burgess v. State, 811 So.2d 557, 572-73 (Ala.Crim.App.1998), rev’d on other grounds, 811 So.2d 617 (Ala.2000). The State articulated a facially race-neutral reason for removing juror F.C., and Doster failed to rebut or show that the reason was merely pretextual. Also, “ ‘There is no evidence of either “ ‘disparate treatment’ ” or “ ‘disparate examination of members of the venire’ ” which would tend to indicate racial discrimination.’ Mitchell [v. State], 579 So.2d [45] at 47 [ (Ala.Crim.App.1991) ].” Gaston v. State, 581 So.2d 548, 550 (Ala.Crim.App.1991). Accordingly, we find no Batson violation in regard to the State’s strike of juror F.C. See Gaston, 581 So.2d at 550.
B.
The prosecutor stated that he struck juror G.G. because she “had a very difficult time answering questions and following the instructions.” The circuit court in responding to the prosecutor’s reasons, stated:
“I recollect that she had great difficulty. I thought, in following a particular question, which I think I restated and she still had difficulty following it.
“And I don’t think anybody else I examined yesterday had any difficulty with it.
“And she seemed to be of some lessened capacity in that regard. And I think that’s an appropriate basis for removing her.”
(R. 1418.)
“The fact that an individual may not be able to keep track of the proceedings because of mental or physical impairment is a valid race-neutral reason for striking that juror.” Yelder v. State, 630 So.2d 92, 100 (Ala.Crim.App.1991), rev’d on other grounds, 630 So.2d 107 (Ala.1992). See also Johnson v. State, 43 So.3d 7, 12 (Ala.Crim.App.2009) (upholding the strike of a juror who lacked “mental acuity”); Nesbitt v. State, 531 So.2d 37 (Ala.Crim.App.1987) (upholding strike of juror who was elderly, inattentive, and had difficulty hearing).
“[R]ace-neutral reasons for peremptory challenges often invoke a juror’s demeanor ... making the trial court’s first-hand observations of even greater importance .... We have recognized that these determinations of credibility and demeanor lie ‘“peculiarly within a trial judge’s province,”’ ibid, (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)), and we have stated that ‘in the absence of exceptional circumstances, we would defer to the [the trial court].’ ”
Snyder v. Louisiana, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).[7]
C.
The prosecutor stated that he struck juror V.W. because her son was *76 currently being prosecuted by his office and because of her behavior when she approached the bench and answered some follow-up questions. The circuit court stated:
“[B]oth of these ladies mentioned by the State, [G.G.] and [V.W.] manifested some oddity in the way they approached the Court that caused the Court, frankly, to wonder about their ability to function well as jurors, to wonder a little bit about them intellectual capacity and to wonder about the extent to which they were carrying on meaningful dialog with the Court.
“I say all that not to criticize them personally. They both seem like very nice people to me. But I say that on the record because sometimes demeanor matters when you are dealing with whether or not a strike has been properly exercised under Batson.
“And I think in both of these situations, while I’m not real big on demean- or, you know, in both of these situations the demeanor was such that I understand for the record what the prosecution is saying.
“And I think those two strikes were properly exercised and race neutral. This was just something that just wasn’t registering when we were talking to those two ladies.”
(R. 1421-22.)
“The district attorney’s prosecution of a member of a veniremember’s family is a race-neutral reason for a peremptory strike.” Spratt v. State, 833 So.2d 662, 664 (Ala.Crim.App.2001). See also Head v. State, 610 So.2d 1202 (Ala.Crim.App.1992); Ward v. State, 539 So.2d 407 (Ala.Crim.App.1988). Moreover, as we stated above: “The fact that an individual may not be able to keep track of the proceedings because of mental or physical impairment is a valid race-neutral reason for striking that juror.” Yelder, 630 So.2d at 100.
The circuit court did not err in finding that the prosecutor’s reasons for removing the three black prospective jurors were race-neutral and did not violate the Supreme Court’s holding in Batson.
III.
Doster next argues that the circuit court erred in failing to suppress his statement to Texas law-enforcement personnel. Doster made four statements to police that were admitted at his trial. On appeal he challenges the admission of only one of those statements, the statement that he made to Sgt. Wesley Long of the Texas Ranger Service.[8] He asserts that this statement was involuntary because he was fatigued and worn down from his weeks living in hotels and being on the road.
Sgt. Long testified that on November 18, 2002, he was stationed in Ozona, Texas, when he was notified that Doster and Phil *77 lips had been taken into custody in connection with their escape from an Alabama jail. He said that he went to the Crockett County Sheriffs Office to speak to Doster and that Doster was nervous and seemed to be “stressed to a certain degree.” Sgt. Long said that Doster’s speech was coherent, that he did not appear to be under the influence of alcohol or any controlled substance, and that he appeared to be “just a little nervous.” He said that he read Dost-er his Miranda rights, that Doster responded that he understood and waived those rights, that Doster indicated that he wanted to talk to Sgt. Long, that he tape-recorded the conversation, and that the tape was transcribed. Sgt. Long read Doster’s November 21 statement to the jury.
When reviewing a trial court’s ruling on a motion to suppress, we use the standard articulated by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.1998):
“For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
“The Fifth Amendment to the Constitution of the United States provides in pertinent part: ‘No person ... shall be compelled in any criminal case to be a witness against himself....’ Similarly, § 6 of the Alabama Constitution of 1901 provides that ‘in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.’ These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
“It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstance.’ Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstance), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, *78 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was overborne at the time he confessed’Xemphasis added).”
718 So.2d at 729 (footnote omitted).
Also,
“[AJlleged fatigue is only a factor to be considered by the jury in determining whether it finds a statement to be involuntary. In Jackson v. State, 674 So.2d 1318, 1326-28 (Ala.Cr.App.1993), aff'd in pertinent part, reversed in part, 674 So.2d 1365 (Ala.1994), on return to remand, 674 So.2d 1370 (Ala.Cr.App.1995), the appellant claimed that his statement was involuntary because ‘he had not slept since the previous night, and the officers continued to interrogate him, despite what he describes as his state of sleep deprivation.’ Id., at 1327. In Jackson, this Court stated that the record did indicate that there was testimony from investigating officers that the appellant appeared ‘sleepy or fatigued,’ and the appellant had stated, during his questioning, that he was tired; however, there was no indication that the appellant ever requested that the questioning cease because of his condition. At the close of the appellant’s statement in Jackson, the record indicated that the officers asked if they had ‘hurt him in any way,’ and the appellant responded, “Tes, y’all not letting me go to sleep, man. I’m tired, man. I was up all f— night_”’ Id., at 1327. In holding that this condition of sleepiness or fatigue constituted but one factor to be considered by the jury, this Court stated:
“This claim is also to be considered by the jury in determining the credibility and weight to accord the statement under the totality of the circumstances. This court has found that where a defendant alleged that his statement was involuntary because, among other reasons, he was deprived of food and drink and ‘was in poor condition physically due to lack of sleep and the consumption of alcohol and drugs,’ this court found that upon a consideration of the totality of the circumstances, the appellant’s statement was voluntary. Callahan v. State, 557 So.2d 1292, 1298-99 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala.1989). Furthermore, the Alabama Supreme Court refused to accept as a ‘coercive factor’ the fact that a juvenile defendant was not questioned until a late hour. Ex parte Smith, 611 So.2d 1023 (Ala.1992).”
Grayson v. State, 824 So.2d 804, 832-33 (Ala.Crim.App.1999).
We have examined all of Doster’s statements and the record, and based on the totality-of-the-circumstances we find that Doster’s statements were voluntary. The circuit court did not err in finding that Doster’s November 21 statement was admissible.
IV.
Doster next argues that the circuit court erred in denying him access to information concerning the prospective jurors that was favorable to the defense. Specifically, he argues that he was entitled to disclosure of the Alabama Justice Information Center Commission (“AJICC”) or National Crime Information Center (“NCIC”) records of the prospective jurors and that the failure to disclose these records violated his equal-protection rights *79 because the State had access to those records but the defense did not.
“This Court has held that arrest and conviction records of potential jurors do not qualify as the type of discoverable evidence that falls within the scope of Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] and that a trial court will not be held in error for denying an appellant’s motion to discover such documents. Slinker v. State, 344 So.2d 1264 (Ala.Cr.App.1977). Cf., Clifton v. State, 545 So.2d 173 (Ala. Cr.App.1988) (the nondisclosed evidence was not exculpatory, thus Brady was inapplicable). In other words, the appellant does not have an absolute right to the disclosure of the arrest and conviction records of prospective jurors. See Slinker, supra. Cf., Davis v. State, 554 So.2d 1094 (Ala.Cr.App.1984), affd, 554 So.2d 1111 (Ala.1989), rehearing overruled, 569 So.2d 738 (Ala.1990), cert, denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991) (defendant is not entitled to the general disclosure of the criminal records of the state’s witnesses); Wright v. State, 424 So.2d 684 (Ala.Cr.App.1982) (No absolute right to disclosure of criminal records of state’s witnesses).
“Several jurisdictions have similarly held. See e.g., People v. Murtishaw, 29 Cal.3d 733, 175 Cal.Rptr. 738, 631 P.2d 446 (1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 464 (1982)(trial judge has discretionary authority to permit defense access to jury records); Moon v. State, 258 Ga. 748, 375 S.E.2d 442 (1988), cert. denied, 499 U.S. 982, 111 S.Ct. 1638, 113 L.Ed.2d 733 (1991) (trial court did not err in denying defendant’s motion for pretrial discovery of state’s juror information records); State v. Wiggins, 556 So.2d 622 (La.App.1990) (defendant is not necessarily entitled to ‘rap sheets’ of prospective jurors); State v. Weiland, 540 So.2d 1288 (La.App.1989) (defendant is not entitled to rap sheets of prospective jurors because those records are useful to state in its desire to challenge jurors with inclinations or biases against state, but are not pertinent to purpose of defendant’s voir dire: to challenge jurors who defendant believes will not approach the verdict in a detached and objective manner); State v. Childs, 299 S.C. 471, 385 S.E.2d 839 (1989) (no right to discovery of criminal records of potential jurors absent statute or court rules requiring such disclosure); Jeffrey F. Ghent, Annot., Right of Defense in Criminal Prosecution to Disclosure of Prosecution Information Regarding Prospective Jurors 86 A.L.R.3d 571 § 4(a) (1978), and the cases cited therein.
“Also, the state has no duty to disclose information that is available to the appellant from another source. Hurst v. State, 469 So.2d 720 (Ala.Cr.App.1985). Here, the appellant could have procured this information from the venire-members themselves during voir dire. See also Clifton, supra (nondisclosure did not prejudice appellant’s defense).”
Kelley v. State, 602 So.2d 473, 477-78 (Ala.Crim.App.1992).
“The traditional common-law rule that, absent a statute or rule of practice providing otherwise, or (in some jurisdictions) other exceptional circumstances, defense counsel in a criminal case has no right of access to information in the possession of the prosecution is consistent with most of the decisions involving prosecution information regarding prospective jurors. Thus, in most of the jurisdictions in which the issue has arisen, the courts have held that at least in the particular circumstances presented, disclosure to defense counsel of prosecution information re *80 garding prospective jurors was not required, whether the information in question related to a prospective juror’s experience or voting record on prior juries, to a prospective juror’s criminal record or other private information obtained from the record or investigative reports of a law enforcement agency, or to miscellaneous or unspecified information.”
Annot. Right of Defense in Criminal Prosecution to Disclosure of Prosecution Information Regarding Prospective Jurors, 86 A.L.R.3d 571 (1978).[9]
Also, “[the defendant] was entitled to request that voir dire questions be directed to jurors to determine the extent of any juror’s involvement in past crimes. That opportunity, if exercised, would negate any prejudicial effect of the State having exclusive access to that information.” Charbonneau v. State, 904 A.2d 295, 319 (Del.Super.Ct.2006). There was no constitutional violation in defense counsel’s not having access to the criminal records of the jurors because counsel had the opportunity to voir dire the prospective jurors concerning their background.
V.
Doster next argues that two of the counts of the indictment returned against him were flawed and were therefore void.
In discussing the distinction between a void and a voidable indictment, we have stated:
“If an indictment charges a crime substantially in the terms of the statute creating the offense and sets out all the material elements thereof, it will generally support a conviction even though it might be subject to a proper motion to dismiss. In such a case, the indictment is not void but merely voidable. A de-feet in an indictment that renders it merely voidable is waived by the failure to raise the issue in a timely manner.”
Bush v. State, 695 So.2d 70, 102 (Ala.Crim.App.1995).
A.
First, Doster argues that count VII of the indictment was defective because, he argues, it failed to allege the specific property that was to have been taken during the burglary. He cites Lanier v. State, 733 So.2d 931 (Ala.Crim.App.1998), and Popwell v. State, 480 So.2d 41 (Ala.Crim.App.1985), to support this claim.
Count VII of the indictment reads:
“The Grand Jury of Covington County charges that before the finding of this indictment, Oscar Roy Doster, whose name is unknown to the Grand Jury other than stated, did intentionally cause the death of Paul D. LeMaster by shooting him with a firearm and that the said Oscar Roy Doster, caused said death during the time that he knowingly and unlawfully entered or remained unlawfully in a dwelling of Paul D. LeMaster, with intent to commit a crime therein, to-wit: theft of property and/or murder and/or robbery....”
(C.R. 3.)
This Court in both Lanier and Popwell held that “a burglary indictment must set forth the crime intended to be committed and ‘the use of broad terms such as “intent to commit a felony” is not sufficient.’” Lanier, 733 So.2d at 936; Popwell, 480 So.2d at 45. However, in Holmes v. State, 505 So.2d 1308 (Ala.Crim.App.1987), we held that a burglary indictment was sufficient if it set forth that “theft was the felony intended to be committed.” 505 So.2d at 1312. See also Clark v. State, 621 So.2d 309, 328 (Ala.Crim.App.1992) *81 (“While it is clear that an indictment for burglary must set forth the specific crime intended to be committed within the dwelling, Popwell v. State, 480 So.2d 41, 45 (Ala.Cr.App.1985), a statement of that offense is sufficient to notify the appellant of the nature of the charges against him.”).
Count VII correctly charged that theft was the underlying felony intended to be committed during the burglary. The indictment was not defective and adequately informed Doster of the charges against him. See Holmes, 505 So.2d at 1312.
B.
Doster next argues that count X of the indictment, which charged him with capital murder committed during a burglary was flawed because, he said, it failed to specify the property that was taken during the robbery.
Count X of the indictment charged as follows:
“The Grand Jury of Covington County charges that before the finding of this indictment; Oscar Roy Doster, whose name is unknown to the Grand Jury other than as stated, did intentionally cause the death of Paul D. LeMaster by shooting him with a firearm and that the said Oscar Roy Doster caused said death during the time that he, while in the course of committing a theft of property, used force against the person of the owner, to-wit: Paul D. LeMaster, with intent to overcome the physical resistance or physical power or resistance of the said Paul D. LeMaster....”
(CR. 5.)
In upholding a similar indictment in Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), we stated:
“The appellant contends that two counts of the capital murder indictment are defective because they do not specify the property he is alleged to have stolen or was attempting to steal, and that this deprived him of adequate notice of what he would be called upon to defend against.
[[Image here]]
“ ‘The indictment ... shall be a plain, concise statement of the charge in ordinary language sufficiently definite to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce the proper judgment.’ Rule 13.2(a), Ala. R. Cr. P. Counts I and II aver the specific property alleged to have been stolen and meet the requirements of the rule. However, Counts III and IV would have been subject to motions to dismiss because they did not inform the appellant of the specific property alleged to have been stolen. Counts III and IV charged the appellant expressly in the terms of the appropriate statutes: §§ 13A-5-40; 13A-6-2; 13A-8-41, and 13A-8-43. If an indictment charges a crime substantially in the terms of the statute creating the offense and sets out all the material elements thereof, it will generally support a conviction even though it might be subject to a proper motion to dismiss. In such a case, the indictment is not void but merely voidable. Ex parte Horton, 456 So.2d 1120 (Ala.1984). A defect in an indictment that renders it merely voidable is waived by the failure to raise the issue in a timely manner. Ex parte Horton; Odom v. State, 625 So.2d 1171 (Ala.Cr.App.1993). In the instant case, the failure of Counts III and IV to specify the property taken rendered the counts merely voidable, and the appellant waived this irregularity by failing to raise it in a timely fashion. This is not an instance where the indictment was so defective that it failed to inform the *82 appellant of the nature and cause of the charge against him. See Ex parte Tomlin, 443 So.2d 59 (Ala.1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984) (by entering a plea at arraignment, a defendant waives any irregularities in the indictment unless the indictment is so defective that it leaves the accused unaware of the nature and cause of the charge against him).”
695 So.2d at 102.
“The failure ... to specify the property taken rendered the counts merely voidable.... ” Bush, 695 So.2d at 102. “ ‘A defect in an indictment that renders it merely voidable is waived by the failure to raise [the] issue at the appropriate time.’ ” Owens v. State, 825 So.2d 861, 863 (Ala.Crim.App.2001), quoting Brown v. State, 481 So.2d 1173, 1176 (Ala.Crim.App.1985). The record shows that Doster did not challenge these two counts of the indictment in a timely manner. Thus, any possible defect was waived by Doster’s failure to timely challenge the indictment on this basis.
Moreover, it appears that count X of the indictment was amended to specify that coins and a truck were the property taken and during the jury instructions the court identified coins and a truck as the property alleged to have been taken during the underlying robbery. See Rule 13.5, Ala. R.Crim. P.[10]
VI.
Doster next argues that the circuit court erred in refusing to dismiss three jurors who, he argues, had unauthorized contact with Officer Tommy Merritt, an Alabama Bureau of Investigations officer who was one of the first law-enforcement officers to arrive at the scene of the murder. Officer Merritt did not testify at Doster’s trial. He cites Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), and Ex parte Pierce, 851 So.2d 606 (Ala.2000), to support his argument that he is entitled to a new trial because of the unauthorized contact.
The following occurred after a recess during trial:
“The Court: Ladies and gentlemen, this is the gentlemen, I was talking to you about earlier, Tommy Merritt, who was in the courtroom a minute yesterday. Do any of you remember seeing him?
“(No verbal response.)
“The Court: All right. Did any of you talk to him?
“(No verbal response.)
“The Court: Anybody say a word to him?
“Unidentified juror: All right. I said he was in charge after Mr. Shaw had left. That’s the only thing I said.
“The Court: All right. Did he say anything to any of you?
“(No verbal response.)
“The Court: All right. Did you hear him talking to anybody else?
“(No verbal response.)
“The Court: Did you hear him say anything in the most remote manner connected to this case?
“(No verbal response.)
“The Court: You can step out, Mr. Merritt.
“[Defense counsel]: Your Honor, the only thing that- — •
“The Court: Step out. Thank you, Mr. Merritt.
*83 “[Defense counsel]: Judge, we are absolutely satisfied.
“The Court: And the three jurors that indicated they had spoken to him, let me ask you to step down here just a moment. I believe it was [G.H.] and — Wasn’t there one other one? Okay.
“(Whereupon, the following bench conference was inaudible to the rest of the jury panel:)
“The Court: Very quietly, ma’am, state your name.
“Juror: [B.T.]
[[Image here]]
“The Court: [B.T.] what, if anything, did you say to Mr. Merritt?
“[B.T.]: After he walked out, I just said, ‘He’s the man in charge now.’ That’s all.
“The Court: Okay. After Mr. Shaw had stepped out?
“[B.T.]: Uh-huh, (affirmative response).
“The Court: Okay. Did he say anything to you?
“[B.T.]: No. He just laughed.
“The Court: And that was it?
“[B.T.]: And that was it?
“[B.T.]: That was it.
[[Image here]]
“The Court: [G.H.]
“Juror [G.H.]: Truly I don’t even know. Except I just greeted the gentlemen, said, T bet you wish you was somewhere else besides in here.’
“The Court: That’s what you said?
“[G.H.]: That’s about all, if I remember correctly.
“The Court: So you just said, ‘Hello. I bet you wish you were somewhere else?’
“[G.H.]: That’s about all there was to it.
“The Court: Nothing about the case whatsoever?
“[G.H.]: No, sir.
“The Court: Or anything about law enforcement or anything?
“[G.H.]: Absolutely not.
“The Court: Okay. Thank you very much.
“The Court: [J.M.]
“[J.M.]: Yes, sir?
“The Court: Did he say anything to you?
“[J.M.]: No, sir. The only thing he said to me was that he happened to be in the wrong place at the wrong time. I had made the remark that he had gotten drafted to watch over us. He said, ‘No, I was just in the wrong place at the wrong time.’
“The Court: Talking about himself?
“[J.M.]: Oh, yes, sir.
“The Court: He was in the wrong place at the wrong time?
“[J.M.]: Yes, sir.
“The Court: Anything else that was said?
“[J.M.]: No, sir.
“The Court: Any reference to the case or anything like that?
“[J.M.]: Not that I heard.
“The Court: Thank you very much.
[[Image here]]
“The Court: For the record, the Court is satisfied there was no improper communication with the jury.
“[Defense counsel]: Thank you, Your Honor, we are certainly, as we said before completely satisfied.”
(R. 1547-53.)
First, as quoted above, not only did defense counsel request that these three jurors not be excused but counsel indicated that he was completely satisfied *84 with the circuit court’s method of handling the issue. Thus, if any error occurred, it was invited by defense counsel’s actions. “ ‘ “Invited error has been applied to death penalty cases. ‘An invited error is waived, unless it rises to the level of plain error.’ Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991).” ’ ” See Saunders v. State, 10 So.3d 53, 88 (Ala.Crim.App.2007), quoting Scott v. State, 937 So.2d 1065, 1075 (Ala.Crim.App.2005), quoting in turn Adams v. State, 955 So.2d 1037, 1050-51 (Ala.Crim.App.2003), rev’d on other grounds, 955 So.2d 1106 (Ala.2005).
Moreover, this Court in Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004), stated the following concerning Turner and Pierce:
“In both Turner [v. Louisiana, 379 U.S. 466 (1965),] and Ex parte Pierce, [851 So.2d 606 (Ala.2000),] the jurors had close and continual contact with key prosecution witnesses throughout the trial; specifically, the law-enforcement officers who were in charge of taking care of the jury, who transported the jurors to and from their lodging each day, who ate meals with the jurors, and who conversed with the jurors on a regular basis throughout the trial, were key prosecution witnesses in both Turner and Ex parte Pierce. Based on this situation, the United States Supreme Court held in Turner, and the Alabama Supreme Court held in Ex parte Pierce, that the defendant’s due-process right to a fair trial by an impartial jury was violated and that prejudice could be presumed from such close and continual contact even if there was no evidence to show that the law-enforcement officers had discussed the facts of the case with the jurors. Specifically, the Court in Turner stated that ‘it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution.’ 379 U.S. at 473, 85 S.Ct. 546.”
914 So.2d at 412-13.
“In both Turner and Pierce, prejudice was presumed because of the close and continual contact between the key witness and a juror. Pierce, 851 So.2d at 610. However, in this case the contact was not close and continual. ‘[P]reju-dice cannot be presumed under the facts in this case as it was in Turner and Ex parte Pierce; rather, as this Court held in Myers v. State, 677 So.2d 807, 810 (Ala.Crim.App.1995), “[i]n order to be entitled to [relief] due to contact by a juror with witnesses or others, prejudice must be shown.” ’ Minor, 914 So.2d at 443.”
Gobble v. State, [Ms. CR-05-0225, February 5, 2010] — So.3d -, - (Ala.Crim.App.2010).
Here, Officer Merritt was not a State’s witness. Also, there was no close and continual contact between Officer Merritt and the jurors; therefore, prejudice was not presumed, and Doster was required to show how he was prejudiced. Gobble, — So.3d at-. Doster failed to meet this burden; thus, he is due no relief on this claim.
VII.
Doster next argues that his presumption of innocence was destroyed when the jurors were allowed to see a videotape of him being arrested, shackled, and placed in a police vehicle when he was taken into custody in Texas.
Corporal Donald Lee Van Zandt of the Texas Department of Public Safety testified that he conducted a traffic stop on a vehicle being driven by Phillips on November 18, 2002, and that Doster was in the passenger seat. The stop, he said, was *85 recorded on his video surveillance camera mounted on his patrol car. Corporal Van Zandt testified that when the red lights in his patrol car are turned on, the video surveillance camera is automatically activated. He testified that there was no audio on the tape because of a malfunction. After the videotape was played, defense counsel stated: “We reviewed the tape with the district attorney from start to finish. And all I think it’s in for is to show the stop. And I don’t think we have any objections to anything on it.” (C.2063.)
Defense counsel had no objection to the videotape being played to the jury; in fact, he specifically stated that he had no objection. Thus, we review this issue for plain error. See Rule 45A, Ala. R.App. P.
“ ‘The presumption of innocence, although not articulated in the Constitution, is a basic component of our system of criminal justice.’ United States v. Dawson, 563 F.2d 149, 151 (5th Cir.1977) (citations omitted). A government entity violates that presumption of innocence when it ‘compels an accused to stand trial before a jury while dressed in identifiable prison garb.’ United States v. Birdsell, 775 F.2d 645, 652 (5th Cir.
United States v. Pryor, 483 F.3d 309, 311 (5th Cir.2007). However, we have not extended the violation of the presumption of innocence to the viewing of the defendant on a videotape while he is in handcuffs. As the United States Court of Appeals for the Eleventh Circuit stated in Gates v. Zant, 863 F.2d 1492 (11th Cir.1989):
“Gates’ other challenge to the videotaped confession is that its admission was unduly prejudicial because it portrayed him in handcuffs. As we have noted previously, although the handcuffs are not always visible, it is evident throughout the fifteen-minute tape that the defendant is handcuffed. We are aware of no cases which address the propriety of handcuffing during a videotaped confession. Nonetheless, the resolution of the issue is apparent from earlier cases addressing handcuffing in and around trials.
“The principal difficulty arising from shackling or handcuffing a defendant at trial is that it tends to negate the presumption of innocence by portraying the defendant as a bad or dangerous person. The Supreme Court has referred to shackling during trial as an ‘inherently prejudicial practice’ which may only be justified by an ‘essential state interest specific to each trial.’ Holbrook v. Flynn, 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). See also Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). This court recently has extended the general prohibition against shackling at trial to the sentencing phase of a death penalty case. Elledge v. Dugger, 823 F.2d 1439, 1450-52 (11th Cir.1987), modified, 833 F.2d 250 (1987), cert. denied, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988).
“On the other hand, a defendant is not necessarily prejudiced by a brief or incidental viewing by the jury of the defendant in handcuffs. Allen v. Montgomery, 728 F.2d 1409, 1414 (11th Cir.1984); United States v. Diecidue, 603 F.2d 535, 549-50 (5th Cir.1979), cert. denied sub nom. Antone v. United States, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980); Wright v. Texas, 533 F.2d 185, 187-88 (5th Cir.1976); Jones v. Gaither, 640 F.Supp. 741, 747 (N.D.Ga.1986), aff'd without opinion, 813 F.2d 410 (11th Cir.1987). The new fifth circuit is among those circuits which adhere to this rule. King v. Lynaugh, 828 F.2d 257, 264-65 *86 (5th Cir.1987), vacated on other grounds, 850 F.2d 1055 (5th Cir.1988); see also United States v. Williams, 809 F.2d 75, 83-86 (1st Cir.1986), cert. denied, 481 U.S. 1030, 107 S.Ct. 1959, 2469, 2484, 95 L.Ed.2d 531, 877, 96 L.Ed.2d 377 (1987); United States v. Robinson, 645 F.2d 616, 617-18 (8th Cir.1981), cert. denied, 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981). In these latter cases, the courts generally have held that the defendant must make some showing of actual prejudice before a retrial is required.
“Thus, the case law in this area presents two ends of a spectrum. This case falls closer to the ‘brief viewing’ end of the spectrum and requires a showing of actual prejudice before a retrial is required. The prosecution showed the fifteen-minute tape twice during several days of trial. The handcuffs were only visible during short portions of the tape.
“Gates has made no attempt to show that he suffered actual prejudice because the jury saw him in handcuffs. Our independent examination of the record also persuades us that he did not suffer any prejudice. Although defense counsel strenuously objected to the admission of the videotape, he did not object to the handcuffing in particular. He did not ask for a cautionary instruction or a poll of the jury. Furthermore, the videotape at issue here was taken at the scene of the crime, not at the police station. Thus, jurors likely would infer that handcuffing was simply standard procedure when a defendant is taken outside the jail. The viewing of the defendant in handcuffs on television rather than in person further reduces the potential for prejudice. In light of the foregoing facts, and the fact that Gates sat before the jury without handcuffs for several days during his trial, we conclude that the relatively brief appearance of the defendant in handcuffs on the videotape did not tend to negate the presumption of innocence or portray the defendant as a dangerous or bad person. We therefore conclude on the particular facts of this case that the handcuffing of Gates during the videotaped confession does not require a new trial.”
863 F.2d at 1501-02. See also Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005).
We have reviewed the videotape. Neither Doster nor Phillips were in shackles. The video does show Van Zant handcuffing Phillips before he requested backup. As we stated in Phillips v. State, 65 So.3d 971 (Ala.Crim.App.2010), when upholding the admission of the same videotape:
“Based upon our independent viewing of the video, we are not persuaded that Phillips suffered any actual prejudice from the jury’s viewing of the video. The jurors were well aware that Phillips and Doster were suspects in a number of crimes in Alabama, including LeMas-ter’s murder, and the theft of his truck. Furthermore, the video depicts what one would expect to transpire when a lone law-enforcement officer stops a vehicle containing two persons who were wanted by law enforcement in another state.”
65 So.3d at 1028. For these reasons, Doster is due no relief on this claim.
VIII.
Doster next argues that the circuit court erred in allowing the State to introduce evidence of the 17 counts that he pleaded guilty to before his capital-murder trial. He asserts that evidence that he escaped from jail and burglarized a VFW Post, Jason Pettie’s trailer, the Florala City Yard, Florala High School, the Cone-cuh Baptist Church, and Pleasant High School was not relevant to any issue of his *87 guilt and was not admissible under Rule 404(b), Ala. R.Evid. P.
Doster did not object to the admission of the collateral-act evidence; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P. (R. 536.)
Rule 404(b), Ala. R. Evid., provides, in pertinent part:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....”
As we stated in Irvin v. State, 940 So.2d 331 (Ala.Crim.App.2005):
“ ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of collateral-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). Moreover, ‘ “[a] trial court will not be placed in error for assigning the wrong reason for a proper ruling, if that ruling is correct for any reason.” ’ Peraita v. State, 897 So.2d 1161, 1183 (Ala.Crim.App.2003), aff'd, 897 So.2d 1227 (Ala.2004) (quoting Nicks v. State, 521 So.2d 1018, 1030-31 (Ala.Crim.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)).
[[Image here]]
“ ‘Before the effective date of Rule 404(b) — January 1, 1996 — the exclusionary rule was explained and followed by the Alabama courts. The adoption of Rule 404(b) did not abrogate prior case-law on this topic.’ Hunter v. State, 802 So.2d 265 (Ala.Crim.App.2000), cert. denied, 802 So.2d 273 (Ala.2001).”
940 So.2d at 345.
Alabama has long recognized the following exceptions to the general exclusionary rule now contained in Rule 404(b), Ala. R. Evid.:
“ ‘These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scienter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes.’ ”
Scott v. State, 353 So.2d 36, 38 (Ala.Crim.App.1977), quoting Wharton’s Criminal Evidence, § 31.
As Professor Charles Gamble explained:
“Evidence of the accused’s commission of another crime or act is admissible if such other incident is inseparably connected with the now-charged crime. Such collateral misconduct has historically been admitted as falling within the res gestae of the crime for which the accused is being prosecuted. Most modern courts avoid use of the term ‘res gestae’ because of the difficulty in measuring its boundaries. The better descriptive expression is perhaps found in the requirement that the collateral act be contemporaneous with the charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence. This is believed to be the ground of admission intended when the courts speak in terms of admitting *88 other acts to show the ‘complete story’ of the charged crime. The collateral acts must be viewed as an integral and natural part of the circumstances surrounding the commission of the charged crime.
“Two theories have been adopted for justifying the admission of collateral misconduct under the present principle. Some courts hold that such contemporaneous acts are part of the charged crime and, therefore, do not constitute ‘other crimes, wrongs, or acts’ as is generally excluded under Rule 404(b). Other courts hold that Rule 404(b) is applicable to these collateral acts but that they are offered for a permissible purpose under that rule — i.e., that such acts are merely offered, rather than to prove bad character and conformity therewith, to show all the circumstances surrounding the charged crime.”
C. Gamble, McElroy’s Alabama Evidence § 69.01(3) (5th ed.1996) (footnotes omitted).
“[One such] ‘special circumstance’ where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. Commonwealth v. Murphy, 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985), quoting Commonwealth v. Williams, 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the ‘res gestae’ exception to the general proscription against evidence of other crimes, is also known as the complete story rationale; i.e., evidence of other criminal acts is admissible ‘to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.’ ”
Commonwealth v. Lark, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988). Evidence of a defendant’s criminal actions during the course of a crime spree is admissible. See Phinizee v. State, 983 So.2d 322, 330 (Miss.App.2007) (“Evidence of prior bad acts is admissible to ‘[t]ell the complete story so as not to confuse the jury.’ ”); Commonwealth v. Robinson, 581 Pa. 154, 216, 864 A.2d 460, 497 (2004) (“The initial assault on Sam-Cali took place approximately two weeks before the Fortney homicide and Sam-Cali’s testimony provided the jury with a ‘complete story’ of Appellant’s criminal spree from the Burghardt homicide in August of 1992 to Appellant’s capture in July of 1993.”); St. Clair v. Commonwealth, 140 S.W.3d 510, 535 (Ky. 2004 (“Here, the trial court properly permitted the Commonwealth to introduce evidence of Appellant’s prior crimes and bad acts that were part of a continuous course of conduct in the form of a ‘crime spree’ that began with Appellant’s escape from an Oklahoma jail and ended with his flight from Trooper Bennett.”); People v. Sholl, 453 Mich. 730, 556 N.W.2d 851 (1996) (“‘Evidence of other acts is admissible when so blended or connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.’ ”); State v. Charo, 156 Ariz. 561, 565, 754 P.2d 288, 292 (1988) (“ ‘The “complete story” exception to the rule excluding evidence of prior bad acts holds that evidence of other criminal acts is admissible when so connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.’”); State v. Long, 195 Or. 81, 112, 244 P.2d 1033, 1047 (1952) (“It is fundamental that the state is entitled to the benefit of any evidence which is relevant to the issue, even though it concerns the commission of the collateral crimes. If evidence of a collater *89 al crime tends to prove the commission of the crime charged in the indictment, the general rule of exclusion has no application.”); State v. Schoen, 34 Or.App. 105, 109, 578 P.2d 420, 422 (1978) (“The evidence, therefore, was relevant to complete the story of the crime charged.... The state is not required to ‘sanitize’ its evidence by deleting background information to the point that the evidence actually presented seems improbable or incredible”).
As we stated in Cothren v. State, 705 So.2d 849 (Ala.Crim.App.1997):
“We agree with the trial court’s ruling in receiving evidence of collateral offenses under the above exceptions. ‘The two crimes are intertwined and connected to such an extent that they form one continuous transaction.’ Bush [v. State], 695 So.2d [70,] 86 [ (Ala.Crim.App.1995) ]. C. Gamble, McElroy’s Alabama Evidence, § 70.01(12)(b) (5th ed.1996), in regard to the res gestae exception, states, ‘The prosecution may prove the accused’s commission of collateral crimes, wrongs or acts if the evidence warrants a reasonable inference that such other crime was a part of the same transaction as the now-charged homicide.’
“The appellant’s foremost argument regarding this issue does not dispute the exceptions to the general exclusionary rule, but rather, argues that the ‘common plan or scheme’ exception does not apply to this particular capital offense. Specifically, he argues that because 12 hours had elapsed between the two murders, the act could not be part of one ‘common plan or scheme.’ We disagree.
“In Ex parte Windsor, 683 So.2d 1042, 1053 (Ala.1996), the Alabama Supreme Court stated:
“ ‘The robbery and murder of Ray-ford Howard and the robbery and murder of Randall Earl Pepper occurred only hours apart, on the same day. Both victims were convenience store owners, and the crimes were factually similar. Therefore, the trial court did not err in admitting evidence regarding Windsor’s participation in the robbery and murder of Randall Earl Pepper.’
“See also Guthrie v. State, 616 So.2d 914 (Ala.Cr.App.1993).
“The Alabama Supreme Court in Windsor created no time limitation. The facts of this case clearly establish that the collateral capital offenses were part of a continuous crime spree.”
705 So.2d at 859-60.
Clearly, evidence of the collateral crimes that were committed during the two-week crime spree was correctly received into evidence in order to tell the complete story of the actions of Doster and his codefen-dant from the time they escaped from the Covington County jail on November 4, 2002, until they were eventually apprehended in Texas on November 18, 2002. The collateral offenses explained how Doster and Phillips came to be in possession of the murder weapon, how they obtained the clothes they were wearing when they were arrested, how they obtained certain other items that were discovered in the truck, and the extent of their efforts to elude police after their escape from the Covington County jail.
However, Rule 403, Ala. R. Evid., contains the following proviso:
“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
*90 As we stated in Killingsworth v. State, 33 So.3d 632 (Ala.Crim.App.2009):
“ ‘[T]he power to make this determination is vested in the trial court. Zielke v. AmSouth Bank, 703 So.2d 354, 361 (Ala.Civ.App.1996); see also C. Gamble, Gamble’s Alabama Rules of Evidence § 403. We will not disturb such a determination unless it is clearly an abuse of discretion.’ ”
33 So.3d at 638, quoting Hayes v. State, 717 So.2d 30, 37 (Ala.Crim.App.1997).
The probative value of the evidence of Doster’s crime spree far outweighed its prejudicial effect. The record shows that each time one of the collateral offenses was mentioned at Doster’s trial, the court methodically instructed the jury that the collateral offense was admissible only to tell the complete story and not as evidence that Doster had a bad character. The circuit court correctly allowed the collateral acts to be admitted.
IX.
Doster argues that his convictions for burglary and theft arising out the same course of conduct as a capital-murder conviction violated the Double Jeopardy Clause of the United States Constitution.
Doster was indicted for 23 counts and pleaded guilty to 17 of the counts before the capital-murder trial. Doster pleaded guilty to the following charges:
Count I — escaping from the Covington County jail while incarcerated for sexual abuse;
Count II — burglary of the VFW Post in Covington County;
Count III — theft of certain property from the VFW Post;
Count IV — burglary of Jason Pettie’s trailer;
Count V — theft of certain items from Pettie’s trailer;
Count XII — theft of LeMaster’s vehicle;
Count XIII — burglary of a building owned by the City of Florala;
Count XIV — theft of property from the Florala building;
Count XV — burglary of the Florala High School;
Count XVI — theft of property from the Florala High School;
Count XVII — criminal mischief by damaging vending machines at the Florala High School;
Count XVIII — burglary of the Pleasant High School;
Count XIX — theft of property from the Pleasant High School;
Count XX — criminal mischief, i.e., destroying vending machines at Pleasant High School;
Count XXI — burglary of the Conecuh Baptist Church;
Count XXII — burglary of the Conecuh Baptist Church Fellowship Hall;
Count XXIII — theft of property from the Conecuh Baptist Church.
Specifically, Doster argues that he cannot be convicted of both burglary with the intent to commit a theft and theft arising out of the same facts.
First, we question whether this issue is properly before this Court. On August 8, 2005, Doster entered a guilty plea to the above-listed charges. At that time the circuit court specifically informed Doster that he was waiving his right to appeal these convictions if he failed to specifically reserve an issue for appellate review. It does not appear that any issues concerning these counts were specifically reserved for appellate review. See Williams v. State, 854 So.2d 625 (Ala.Crim.App.2003).
Moreover, even if this issue was properly before this Court, we would find that Doster’s double-jeopardy rights were not *91 violated. As this Court stated in Sheffield v. State, 959 So.2d 692 (Ala.Crim.App.2006):
“Contrary to Sheffield’s claim, because the burglary and theft offenses each required proof of an element not present in the other offense, there was no double-jeopardy violation in convicting Sheffield for third-degree burglary and first-degree theft arising out of the same course of conduct. See Ex parte Dixon, 804 So.2d 1075, 1078-79 (Ala.2000); Ex parte McKelvey, 630 So.2d 56, 57 (Ala.1992). However, as the Supreme Court noted: ‘where a defendant is charged with both burglary and theft ... arising from a transaction that is the foundation for both charges, the defendant may receive only one punishment.’ Ex parte McKelvey, 630 So.2d at 57 (citing Vason v. State, 574 So.2d 860, 863 (Ala.Crim.App.1990), and numerous other cases recognizing this proposition); see also Brown v. State, 821 So.2d 219, 225 (Ala.Crim.App.2000) (noting that a defendant may be sentenced for burglary and theft convictions arising out of the same transaction if the sentences are ordered to run concurrently, rather than consecutively).”
959 So.2d at 696-97. Convictions for both burglary and theft arising out of the same set of facts do not violate the Double Jeopardy Clause. Neither is there a violation of Ex parte McKelvey, 630 So.2d 56 (Ala.1992), because the sentences for those convictions were ordered to be served concurrently. (R. 513.)
Nor was it a violation of the Double Jeopardy Clause to convict Doster of criminal mischief and burglary arising out of the same set of facts. At the time of the offense, § 13A-7-21, Ala.Code 1975, read:
“(a) A person commits the crime of criminal mischief in the first degree if, with intent to damage property, and having no right to do so or any reasonable ground to believe that he has such a right, he inflicts damages to property:
“(1) In an amount exceeding one thousand dollar ($1,000)....”[11]
Section 13A-7-7, Ala.Code 1975, states:
“A person commits the crime of burglary in the third degree if he knowingly enters or remains unlawfully in a building with intent to commit a crime therein.”
In Rowell v. State, 447 So.2d 193 (Ala.Crim.App.1983), we stated:
“A comparison of the definitions of the crimes of criminal mischief in the second degree and burglary in the third degree discloses that there are essential elements of one offense which are not elements of the other. These crimes are therefore two separate and distinct offenses. ‘A plea of former jeopardy is unavailing unless the offense presently charged is precisely the same in law and fact as the former one relied on under the plea.’ Racine v. State, 291 Ala. 684, 687, 286 So.2d 896 (1973). Illinois v. Vitale, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980), does not apply since neither is criminal mischief a lesser included offense of burglary as a matter of law nor was it necessary for the State to sustain its burglary case to prove the conduct constituting criminal mischief.”
447 So.2d at 196. Compare C.P. v. State, 597 So.2d 246 (Ala.Crim.App.1992) (under facts of case criminal mischief was lesser-included offense of attempted burglary). Criminal mischief was not a lesser offense of burglary; therefore, there was no violation of the Double Jeopardy Clause.
*92 X.
Doster next argues that prosecutorial misconduct denied him a fair and impartial trial. He cites several different grounds in support of this contention.
Initially, we note that Doster did not object to the now challenged instances of prosecutorial misconduct.
“ ‘ “While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.” Ex parte Kennedy, 472 So.2d [1106,] at 1111 [ (Ala.1985) ] (emphasis in original). “This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.” Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).’ ”
Ex parte Windsor, 683 So.2d 1042, 1061 (Ala.1996), quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990).
Also,
“ ‘During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’ Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). ‘In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,’ Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), affd, 590 So.2d 369 (Ala. 1991). ‘In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.’ Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). ‘To justify reversal because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.’ Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).”
Coral v. State, 628 So.2d 954, 985 (Ala. Crim.App.1992). The standard of review we use in evaluating a prosecutor’s argument is not whether the defendant was prejudiced but whether the comment “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
Moreover, the court instructed the jury that statements of counsel were not evidence. “It is well settled that jurors are presumed to follow, not disregard, the trial court’s instructions.” Brooks v. State, 973 So.2d 380, 409 (Ala.Crim.App.2007).
With these principles in mind, we review Doster’s arguments.
A.
First, Doster asserts that the prosecutor misstated the evidence during closing arguments in the guilt phase. Specifically, Doster challenges the following argument:
“[Prosecutor — reading Doster’s statement]: The night after the escape, me *93 and Bobby went to a mobile home that belongs to Jason Pettie. I know Jason and he is a friend of mine.
“That’s a lie. Jason Pettie says they are not friends.”
(R. 2576) (emphasis added).
 Doster asserts that Pettie did not testify that he was not friends with Doster. The record shows that Pettie testified that Doster had been to his trailer on one occasion and that at the time he had been to his trailer Pettie had invited Doster’s brother and not Doster. Certainly, it was a reasonable inference from Pet-tie’s testimony that Pettie was friends with Doster’s brother and that Pettie was not Doster’s friend.
“A prosecutor as well as defense counsel has a right to present his impressions from the evidence, and [h]e may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981). Henderson v. State, 584 So.2d 841, 856-57 (Ala.Crim.App.1988), remanded on other grounds, 585 So.2d 862 (Ala.1991).”
Sneed v. State, 1 So.3d 104, 140 (Ala.Crim.App.2007). “A prosecutor may argue all legitimate inferences that may be drawn from the evidence.” Gobble v. State, [Ms. CR-05-0225, February 5, 2010] - So.3d -, -(Ala.Crim.App.2010). We fined no reversible error. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). This was a permissible argument.
B
Doster next challenges the following argument made by the prosecutor in his closing argument in the guilt phase:
“They can enter that trailer and hide out. But, most importantly, not only could they hide out, but, man what a gold mine they had inside because [Doster] knew that they had guns inside.”
(R. 2540) (emphasis added).
Doster asserts that there was no testimony that he knew there were guns in Pettie’s trailer. However, as the State correctly contends in its brief, this was a legitimate and logical inference that could have been drawn from Doster’s statement to police. Doster told police that he knew where Pettie hid the key to his gun cabinet. Certainly, it was not a giant leap for the prosecutor to infer from this statement that Doster also knew that Pettie had guns in his trailer. This was a legitimate inference that could have been drawn from the evidence presented through Doster’s statement and was a permissible argument. See Coral v. State, 628 So.2d at 985.
C.
Doster asserts that the district attorney initiated and proceeded on the capital-murder charges without having the requisite good faith to prosecute him for the offense. He bases this entire argument on one sentence in a letter the prosecutor wrote to Sgt. Jim Huggins of the Texas Rangers. In the letter, the prosecutor urged Texas law-enforcement officials to forward to him information concerning a second homicide in Texas that Doster had been accused of committing when he escaped a second time in April 2005. The prosecutor wrote:
“An honest assessment on my case against Doster: if I can’t introduce evidence of the second murder and don’t have Phillips’s testimony, I doubt I will get a capital murder conviction.”
(C.R. 3683.)
First, Doster did not object at trial; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
*94 “A selective-prosecution claim asks a court to exercise judicial power over a ‘special province’ of the Executive. Heckler v. Chaney, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985). The Attorney General and United States Attorneys retain ‘ “broad discretion” ’ to enforce the Nation’s criminal laws. Wayte v. United States, 470 U.S. 598, 607, 105 S.Ct. 1524, 1530-1531, 84 L.Ed.2d 547 (1985) (quoting United States v. Goodwin, 457 U.S. 368, 380, n. 11, 102 S.Ct. 2485, 2492, n. 11, 73 L.Ed.2d 74 (1982)). They have this latitude because they are designated by statute as the President’s delegates to help him discharge his constitutional responsibility to ‘take care that the laws be faithfully executed.’ U.S. Const., Art. II, § 3; see 28 U.S.C. §§ 516, 547. As a result, ‘[t]he presumption of regularity supports’ their prosecutorial decisions and, ‘in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.’ United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926). In the ordinary case, ‘so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.’ Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978).”
United States v. Armstrong, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).
“Our analysis begins with the premise that the district attorney has ‘wide discretion in determining whether to prosecute an individual.’ Commonwealth v. Clint C, 430 Mass. 219, 228, 715 N.E.2d 1032 (1999). Prosecutorial decisions enjoy a presumption of good faith. See Commonwealth v. Franklin, 376 Mass. 885, 894, 385 N.E.2d 227 (1978). The presumption of prosecutorial regularity is broad enough to encompass some selectivity in prosecutorial targets. Id. .... Deference to prosecutorial decision-making is borne of the recognition that decisions whether and how to prosecute entail policy considerations, such as deterrence value and prosecuting priorities, that are ill suited to judicial review.”
Commonwealth v. Bernardo B., 453 Mass. 158, 167, 900 N.E.2d 834, 842 (2009). See also Salaiscooper v. Eighth Judicial Dist. Court, 117 Nev. 892, 903, 34 P.3d 509, 516 (2001) (“In exercising [discretion to prosecute] the district attorney is clothed with the presumption that he acted in good faith and properly discharged his duty to enforce the laws.”); In re Smith, 301 B.R. 96, 102 (M.D.Ga.2003) (“[t]he district attorney’s motives in this case have not been drawn into question at all. Thus, there are no facts from which to conclude that the prosecution against Debtor is being pursued in bad faith.”); see State v. Anderson, 8 So.3d 1033 (Ala.Crim.App.2008) (we presume that prosecutor acted in good faith and without malice).
There is absolutely no indication that the prosecutor acted in bad faith; thus, we must presume that his actions were in good faith and without malice. Also, the prosecutor did not say that he was not going to try Doster for capital murder but that absent this evidence he feared that he would be able to obtain a conviction for capital murder.
Moreover,
“A duty rests upon the prosecuting attorney to prosecute in his county or district, on behalf of the people, all public offenses. Where a statute so provides, the prosecuting attorney must ini *95 tiate proceedings for the prosecution of persons charged with or reasonably suspected of public offenses, when he has information that such offenses have been committed. But, as a general rule, if a prosecutor has possible cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, rests entirely in his discretion. In other words, the duty to prosecute is not absolute, but qualified, requiring of the prosecuting attorney only the exercise of a sound discretion, which permits him to refrain from prosecuting whenever he, in good faith and without corrupt motives or influences, thinks that a prosecution would not serve the best interests of the state, or that, under the circumstances, a conviction could not be had, or that the guilt of the accused is doubtful or not capable of adequate proof.
“A prosecutor is not subject to judicial supervision in determining what charges to bring and how to draft accusatory pleadings; he is protected from judicial oversight by the doctrine of separation of powers. Thus, it has been held that mandamus will not lie to compel a prosecuting attorney to institute a criminal prosecution, since the acts of a prosecuting attorney are not purely ministerial acts, but involve in a large measure learning and the exercise of discretion.”
Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907, 910 (Ala.1992), quoting 63 Am. Jur.2d Prosecuting Attorneys § 24 (1984). Doster is due no relief on this claim.
D.
Next, Doster argues that the prosecutor “manipulated the indictment process” by indicting him on multiplicitous counts and that the prosecutor should have elected before trial what counts he would proceed on.
Doster did not raise this issue at trial; thus, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Doster was charged with six counts of capital murder. Before the case was submitted to the jury, the prosecutor dismissed three of the counts, and the case was submitted to the jury on the remaining three counts: murder made capital because it was committed during a robbery, murder made capital because it was committed during the course of a burglary, and murder made capital because it was committed by shooting into an occupied dwelling.
“ A prosecutor is not subject to judicial supervision in determining what charges to bring and how to draft accusatory pleadings; he is protected from judicial oversight by the doctrine of separation of powers.’ ” Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d at 910, quoting 68A Am. Jur.2d Prosecuting Attorneys § 24 (1984). Doster is due no relief on this claim.
XI.
Doster next argues that there was insufficient evidence to convict him of any of the counts of capital murder. Specifically, he argues that there was no evidence that he had the specific intent to kill LeMaster. It was undisputed that Dost-er’s codefendant, Bobby Phillips, actually fired the fatal shot.
“ ‘In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state’s evidence establishes a prima facie *96 case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983); Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State.’ ”
Killingsworth v. State, [Ms. CR-06-0854, November 13, 2009] — So.3d - (Ala.Crim.App.2009), quoting Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Crim.App.1993).
As this Court stated in Smith v. State, 745 So.2d 922 (Ala.Crim.App.1999):
“ ‘[N]o defendant is guilty of a capital offense unless he had an intent to kill.’ Lewis v. State, 456 So.2d 413, 416 (Ala.Cr.App.1984). ‘However, a non-trigger-man can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself.’ Id. at 417.
‘ “[A] defendant who does not personally commit the intentional killing which is part of the capital offense is nonetheless guilty of it and can be convicted of the capital offense, if that defendant intentionally promotes or assists in the commission of the intentional killing which is actually done by another.” ’ Id. (citation omitted). ‘Pulling the trigger is only one factor in determining the intent to kill.’ Ex parte Raines, 429 So.2d 1111, 1113 (Ala.1982).
“ ‘... To affirm a finding of a “particularized intent to kill,” the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill.’ Ex parte Raines, 429 So.2d at 1113.”
745 So.2d at 932-33.
In Killingsworth v. State, supra, we specifically addressed a nontriggerman’s claim of insufficient evidence to establish intent to kill necessary for a capital-murder conviction. In upholding Killingsworth’s conviction, we stated:
“Killingsworth was charged with committing murder through the use of a deadly weapon while the victim was in a vehicle, see § 13A-5-40(a)(17), Ala.Code 1975; through the use of a deadly weapon fired from a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975; and during the course of a first-degree robbery or an attempt thereof, see § 13A-5-40(a)(2), Ala.Code 1975. At trial, the State proceeded under an accomplice liability theory. Alabama’s accomplice liability statute provides:
“ ‘A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
[[Image here]]
“‘(2) He aids or abets such other person in committing the offense. ... ’
“§ 13A-2-23, Ala.Code 1975.
“ ‘The words “aid and abet” encompass all assistance by acts, words of encouragement, or support, or pres *97 ence, actual or constructive, to render assistance should it become necessary. Wright [v. State, 494 So.2d 936 (Ala.Crim.App.1986) ]; Sanders v. State, 423 So.2d 348 (Ala.Cr.App.1982). Actual participation in the crime need not be proved by positive testimony to convict someone of aiding and abetting. “The jury is to determine whether the appellant’s participation exists and the extent of it from the conduct of the parties and all the testimony presented.” Walls v. State, 378 So.2d 1186, 1191 (Ala.Cr.App.1979), cert. denied, Ex parte Walls, 378 So.2d 1193 (Ala.1980). Such facts as the defendant’s presence in connection with his companionship, and his conduct at, before and after the commission of the act, are potent circumstances from which participation may be inferred.’
“Henry v. State, 555 So.2d 768, 769 (Ala.Crim.App.1989).
“ ‘Any word or act contributing to the commission of a felony, intended and calculated to incite or encourage its accomplishment, whether or not the one so contributing is present, brings the accused within the statute that makes any person concerned in the commission of a felony, directly or indirectly, a principal.... No particular acts are necessary to make one an aider and abettor; the common enterprise or adventure may have been entered into on the spur of the moment without prearrangement or participation.’
“Scott v. State, 374 So.2d 316, 318-19 (Ala.1979). And,
“ ‘[w]here the evidence is conflicting as to the defendant’s connection as an accomplice or co-conspirator, a jury question is presented.’ Sanders v. State, [423 So.2d 348 (Ala.Crim.App. 1982) ], citing Watkins v. State, 357 So.2d 156, 160 (Ala.Crim.App.1977), cert. denied, 357 So.2d 161 ([Ala.] 1978).’
“Henry, 555 So.2d at 770.
“ ‘ “[U]nder the accomplice liability doctrine, a nontriggerman accomplice may be convicted of the capital offense of double murder only if he had the particularized intent that both victims be killed. In addition, ‘[t]o affirm a finding of a “particularized intent to kill” the jury must be properly charged on the intent to kill issue.’ ” ’
“‘Tomlin v. State, 591 So.2d 550, 557 (Ala.Cr.App.1991) (citations omitted). “ ‘Intent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.’ ” French v. State, 687 So.2d 202, 204 (Ala.Cr.App.1995), rev’d on other grounds, 687 So.2d 205 (Ala.1996) (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Cr.App.1986)).
“ ‘ “ ‘The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala.Crim.App.1984); Craig v. State, 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.1982).’ Loper v. State, 469 So.2d 707, 710 (Ala.Cr.App.1985). “Where one assaults another by the use of a deadly weapon, the law will infer from that fact that he designed to accomplish the probable and natural results of his act, in the absence of proof to the contrary.’ Snipes v. State, 364 So.2d 424, 426 (Ala.Cr.App.1978).”
“ ‘Oryang v. State, 642 So.2d 989, 994 (Ala.Cr.App.1994).’
*98 “Wilson v. State, 777 So.2d 856, 932-33 (Ala.Crim.App.1999).
“ ‘Pulling the trigger is only one factor in determining intent to kill. Ritter v. State, 375 So.2d 270, 274-275 (Ala.1979). From the testimony concerning the defendant’s words and actions during the course of the robbery, the jury had sufficient evidence from which to infer that the defendant was prepared to kill, intended to kill, and supported Watkins in his killing of Mr. Mayfield and, thus, that the defendant was an accomplice to the intentional killing [the victim].’
“Ex parte Raines, 429 So.2d 1111, 1113 (Ala.1982). Finally, ‘ “[w]hether a non-trigger man aided and abetted the actual killing itself, such as by being present to render assistance in the killing itself if it becomes necessary, will almost always be a jury question.” ’ Gamble v. State, 791 So.2d 409, 445 (Ala.Crim.App.2000) (quoting Rowell v. State, 570 So.2d 848, 851 (Ala.Crim.App.1990) (quoting in turn Carnis, Alabama’s 1981 Capital Punishment Statute, 42 Ala. Law. 456, 469 (1981))).
“Based on the evidence set forth in detail above, the jury could have believed that Killingsworth supported Con-nell’s actions, that he was ready and willing to assist Connell if and when it became necessary, and that his participation in the incident was significant. Therefore, the jury could have reasonably concluded that Killingsworth was an accomplice and that he had the particularized intent that Steven be killed. Accordingly, his argument to the contrary is without merit.”
— So.3d at -.
The State’s evidence showed that Doster led Phillips to Pettie’s trailer and that Doster knew that Pettie had guns in his trailer. Doster said that he loaded two of those guns. Doster also told police that after Phillips shot LeMaster they both went into LeMaster’s trailer to locate the keys to LeMaster’s truck, that LeMaster had been cooking a hamburger when Phillips shot him, and that Doster turned off the stove. Here, based on Doster’s own admissions as set out above in our statement of facts, there was evidence indicating that Doster was present when Phillips fired the fatal shot, that he was ready to assist Phillips if necessary, that his participation in the events was significant, and that he supported Phillips in his murder of LeMaster and covering up the murder. There was sufficient evidence to present the issue of Doster’s intent to the jury for its consideration. There is no reason to disturb the jury’s verdict in this case.
XII.
A.
Doster next argues that the circuit court erred in erroneously instructing the jury that Doster’s statement was entitled to more weight than the other evidence.
Doster did not object to the circuit court’s instructions on the law on confessions; thus, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The circuit court gave the following instruction concerning the statements that Doster made to law-enforcement officers:
“You are going to hear testimony in a few moments about a statement given by the defendant.
“And the law in this respect is that all statements, confessions, or statements against interest made by a defendant are presumed to be involuntary unless they are first shown to have been voluntarily made; that is, that the statement was made by the defendant freely and voluntarily and without any threat or *99 fear or torture or the offer of hope of reward.
“The burden is first upon the Court to determine whether or not you may hear the statement.
“And then the burden is on the State to satisfy you beyond a reasonable doubt that the statement of the defendant was a voluntary statement and was given by him without torture or the fear of punishment or hope of reward on the part of those who had him in custody at the time of the alleged giving and making of the statement.
“Now, in a moment I’m going to allow this statement into evidence. It will be before you as a part of the evidence case.
“However, you are not bound by any alleged statement or confession or statement against interest of the defendant.

“Though I will tell you that confessions of guilt when freely and deliberately made are among the most effectual and satisfactory proofs that can be received in courts of law.

“Though I’m allowing this statement to come in, whatever you, the jury, determine to be the truth of the matter is what counts.
“And, if you are satisfied that the statement was obtained unlawfully or by wrongful means such as torture or the threat of fear of punishment or hope of reward or anything like that you have a right to disregard such a statement.”
(R. 2417-20; emphasis added.) Doster challenges the emphasized portion of the above instruction.
Doster did not object to the above instruction; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P. (R. 536.)
“‘“In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’ Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929 (1998).’”
“Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998). Moreover, ‘[w]hen reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).’ Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).”
Snyder v. State, 893 So.2d 488, 548 (Ala.Crim.App.2003).
In Williams v. State, 782 So.2d 811 (Ala.Crim.App.2000), we considered a jury instruction that was virtually identical to the instruction in this case. In finding no reversible error, we stated:
“After reviewing all of the trial court’s instructions regarding confessions in the context of its entire oral charge, we conclude that they were not improper. They did not inform the jury that the trial court had determined that the appellant voluntarily made the statements, and they clearly instructed the jury that it was ultimately responsible for determining whether the appellant voluntarily made the statements. See Bush v. State, 523 So.2d 538 (Ala.Cr.App.1988); Ex parte Singleton, 465 So.2d 443 (Ala.1985).”
*100 782 So.2d at 838. Earlier in Singletary v. State, 473 So.2d 556, 575 (Ala.Crim.App.1984), we upheld a similar instruction and noted:
“There is some merit, we think, in the exception taken by defense counsel as to that part of the court’s oral charge in which he said ‘that confessions of guilt or statements against interest, when freely and deliberately made are among the most effectual and satisfactory proofs that can be received in courts of justice,’ but upon consideration of the full context of the statement, we are convinced that it was not substantially harmful to defendant. Whatever tendency there was unfavorable to the defendant as to evidence of confessions or admissions was offset by what the court said favorable to defendant on the subject.”
For the foregoing reasons we find no plain error in the circuit court’s instruction on weight to attach to Doster’s statements to police.
B.
Doster next argues that the circuit court erred in allowing the jury to have a copy of the written charges during its deliberations. Doster specifically argues that the court violated Rule 21.1, Ala. R.Crim. P.
During deliberations, the jury returned with the following question: “May we have a copy of the charges with their definitions?” The circuit court responded: “If it would be satisfactory, I will give you my written charge.... ” (R. 2729.) Doster did not object when the circuit court responded that it would give the jury a copy of its written charges; therefore, we review this issue for plain error. See Rule 45A, Ala. R.App. P.
Rule 21.1, Ala. R.Crim. P., states, in pertinent part:
“Neither a copy of the charges against the defendant nor the ‘given’ written instructions shall go to the jury room; provided, however, that the court may, in its discretion, submit the written charges to the jury in a complex case.”[12]
The Committee Comments to Rule 21, Ala. R.Crim. P., provide:
“Under this rule, the ordinary procedure should be that the jury will not take with it a copy of the charges against the defendant; nevertheless, the rule recognizes that in a complex case, having a copy may help the jury to understand and determine the issues. The rule, therefore, allows the judge the discretion to give the jury a copy of the charges when he feels it would be helpful to do so.”
See Johnson v. State, [Ms. CR-99-1349, October 2, 2009] — So.3d -, - (Ala.Crim.App.2009) (“In a case such as the present, that involves capital murder and where the jury clearly indicated by their question that they were having difficulty understanding the aggravating and the mitigating circumstances, the trial judge did not abuse his discretion in deciding to send the written instructions back with the jury.”); Apicella v. State, 809 So.2d 841, 862 (Ala.Crim.App.2000) (“A trial court’s determination on whether to submit written charges to the jury in a complex case will not be overturned absent a showing of an abuse of discretion.”); Wright v. State, 740 So.2d 1147, 1150 (Ala.Crim.App.1999) *101 (“Based on the trial court’s finding [that the case was complicated] and the jury’s request for the definition of first-degree robbery, we find that the trial court did not abuse its discretion when it gave the jury a written copy of the definition of first-degree robbery.”).
Clearly, the circuit court acted within its discretion in allowing the jury to have a copy of its written charges during deliberations. The circuit court did not violate Rule 21.1, Ala. R.Crim. P.
XIII.
Doster next argues that the circuit court failed to secure a reliable and adequate record of the trial proceedings for appellate review because, he argues, there are numerous references to off-the-record discussions in the transcript. Dost-er states the following in his brief:
“The court went off the record during its guilt-phase charging conference. (R. 2519-20.) While counsel made clear it would express its objections for the record after the conference, in a death penalty case, appellate courts may review for plain error. The failure to record the conference and afford Mr. Doster his right to appeal the trial court’s determinations denies him the reliability necessary for imposition of the death penalty. Similarly, there were numerous other, off-the record conversations that were not recorded. See, e.g., R. 2291, 2856, 2374.”
(Doster’s brief, at pp. 108-09.)
The record shows that the following occurred:
“The Court: One last thing. You know, there has been a Motion for Full Recordation, and I have tried to comply with that.
“[Defense counsel]: You have, your honor.
“The Court: I have tried to comply, you know, with putting everything on the record the way you all wanted me to.
“Now, you know, this charge conference is not — I mean, unless you all just want me to have [the court reporter] sitting there typing down our rattlings and ramblings while we try to figure out what should or shouldn’t go in the charge—
“[Defense counsel]: Judge, I don’t think that’s necessary. We can — When we get down to the final cut, we can say what we object to being there or not being there.
“The Court: Yeah. I’ll give you every opportunity to state full and vociferous objections to anything you believe I get wrong.
“[Defense counsel]: I don’t see the need for the recordation of the charge conference until we get to the end of it. And, insofar as I need to, I withdraw the Motion for Full Recordation with that exception.
“The Court: Okay. All right.”
(C. 2519-20.) Clearly, if any error occurred in not recording the charge conference, that error was invited by counsel’s actions. Invited error is waived unless it rises to the level of plain error.
Also, the first page reference identified in Doster’s brief is when the circuit court is discussing the typographical errors in the transcript of Doster’s statements. The record then lists the typographical errors that were contained in the transcript. In another instance, the State was attempting to organize the presentation of an exhibit. Yet in another instance, the prosecutor states that he had evidence the custodian needed to bring into the courtroom — an exhibit that was marked for identification. It is clear that no substantial portions of the record are missing from the record that was certified to this Court. The rec *102 ord filed with this Court consists of 45 volumes.
In Wynn v. State, 804 So.2d 1122 (Ala.Crim.App.2000), we stated:
“[W]e note that it should have been apparent to the defense during the trial that the court reporter was not recording certain sidebars. In fact, during the hearing on the appellant’s motion for a new trial, trial counsel admitted, ‘I do recall sidebars without a court reporter taking down the transcript. At least not without my knowledge.’ (R.1944.) Defense counsel could have easily reminded the trial court that it had granted his motion for full recordation of the proceedings and remedied the omissions at that time. Therefore, this error was invited by the appellant.
[[Image here]]
“... A review of the portions of the record before and after the unrecorded sidebars clearly indicates that the unrecorded sidebars pertained to general, administrative matters, such as notifying the trial court that an objection needed to be made outside of the hearing of the jury and discussing the timing of breaks, that did not affect the outcome of the trial. In fact, on several occasions after an unrecorded sidebar occurred, the trial court stated for the record the substance of what occurred during the sidebar. In addition, the actual objections and discussions about the objections are included in the record on appeal. Therefore, under the facts of this case, we conclude that the error that resulted from the failure to record certain sidebars was harmless.”
804 So.2d at 1143^5.
There is no indication that substantial portions of the record are missing. Therefore, any error in failing to transcribe all the off-the-record discussions was at most harmless. Wynn, 804 So.2d at 1145.

Penalty-Phase Issues

XIV.
Doster argues that his death sentence violates the United States Supreme Court’s decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In Ring, the United States Supreme Court held that its earlier decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), applied to death-penalty cases; thus, any fact that could increase the maximum penalty to death must be presented to a jury and must be found to exist beyond a reasonable doubt.
A.
First, Doster asserts that by imposing the death sentence the circuit court found that the aggravating circumstances outweighed the mitigating circumstances; therefore, he argues, it made a factual determination that, according to Ring, was within the exclusive province of the jury. Moreover, he argues, the jury found that the mitigating circumstances outweighed the aggravating circumstances, and that factual determination by the jury was rejected by the circuit court.
The Alabama Supreme Court specifically rejected this argument in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), and stated:
“Contrary to Waldrop’s argument, the weighing process is not a factual determination. In fact, the relative ‘weight’ of aggravating circumstances and mitigating circumstances is not susceptible to any quantum of proof. As the United States Court of Appeals for the Eleventh Circuit noted, While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard ... the relative weight is *103 not.’ Ford v. Strickland, 696 F.2d 804, 818 (11th Cir.1983). This is because weighing the aggravating circumstances and the mitigating circumstances is a process in which ‘the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.’ Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). Moreover, the Supreme Court has held that the sentencer in a capital case need not even be instructed as to how to weigh particular facts when making a sentencing decision. See Harris v. Alabama, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (rejecting ‘the notion that “a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required” ’ (quoting Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)) and holding that ‘the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer’).
“Thus, the weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum. See California v. Ramos, 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (‘Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.’); Zant v. Stephens, 462 U.S. 862, 902, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in the judgment) (‘sentencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does’).”
859 So.2d at 1189.[13] Doster is due no relief on this claim.
B.
Second, Doster asserts that the use of an element of the capital offense as an aggravating circumstance violates his rights because, he says, it fails to “narrow the class of individuals sentenced to death.”
The United States Supreme Court addressed this issue in Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), and stated:
“Here, the ‘narrowing function’ was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that ‘the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.’ The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exer *104 cise of discretion. The Constitution requires no more.”
484 U.S. at 246. See also Morris v. State, 60 So.3d 326 (Ala.Crim.App.2010). Doster is due no relief on this claim.
C.
Doster next argues that the court diminished the role of the jury in sentencing by referring to its verdict as a recommendation. Doster specifically argues that after Ring, the circuit court’s instructions that the jury’s verdict was a recommendation runs afoul of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In Caldwell v. Mississippi, the United States Supreme Court held that “[i]t is constitutionally impermissible to rest a death sentence on, a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant’s death rests elsewhere.” 472 U.S. at 328-29.
“We have repeatedly stated that a trial court does not diminish the jury’s role by stating that its verdict in the penalty phase is a recommendation or an advisory verdict. Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), on remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995); White v. State, 587 So.2d 1218 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).”
Smith v. State, 795 So.2d 788, 837 (Ala.Crim.App.2000).
Also,
“ ‘[The defendant] also argues that Ring requires penalty-phase relief when the jury is told that its verdict is “advisory” or merely a “recommendation.” Contrary to [the defendant’s] contention, Ring does not address the advisory nature of a jury’s sentencing recommendation. [The defendant’s] jury was properly informed that under Alabama law, its verdict was an advisory one. See § 13A-5-46, Ala. Code 1975. Thus, the jury was not misled regarding its role in the sentencing decision. See Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).’”
Blackmon v. State, 7 So.3d 397, 432 (Ala.Crim.App.2005), quoting Duke v. State, 889 So.2d 1, 43 (Ala.Crim.App.2002). See also Evans v. State, 975 So.2d 1035, 1053 (Fla.2007) (“The Court has also repeatedly rejected objections to Florida’s standard jury instructions based on Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).”). Doster is due no relief on this claim.
D.
Doster also argues that Alabama’s sentencing scheme is “standard-less” and violates the Eighth Amendment and the Equal Protection Clause of the Constitution.
Alabama’s death-penalty sentencing scheme has repeatedly withstood constitutional attacks.
“The appellant maintains that the jury override provision of Ala.Code 1975, § 13A-5-47(e), is unconstitutional. He claims that the statute contains no guidelines for the sentencing judge to follow and that the statute violates the Eighth Amendment, particularly in a *105 case where, as here, the jury unanimously recommends a sentence of life imprisonment without parole.
“Sentencing by a jury is not constitutionally required. Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Proffitt v. Florida, 428 U.S. 242, 251-52, 96 S.Ct. 2960, 2966-67, 49 L.Ed.2d 913 (1976), and § 13A-5-47(e) set ‘out a standard of review for jury override that meets constitutional requirements.’ McMillian v. State, 594 So.2d 1253, 1272-73 (Ala.Cr.App.1991), remanded on other grounds, 594 So.2d 1288 (Ala.1992). The argument that the jury override provision of § 13A-5-47(e) is constitutionally infirm because it allows for the ‘arbitrary and standardless’ imposition of the sentence of death has been repeatedly rejected by the appellate courts of this state. See, e.g., Ex parte Jones, 456 So.2d 380, 381-83 (Ala.1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985); McMillian v. State, 594 So.2d at 1272; Parker v. State, 587 So.2d 1072, 1098 (Ala.Cr.App.1991). See also Ex parte Giles, 632 So.2d 577 (Ala.1993) (holding that Ala. Const. § 11 ‘does not preclude judicial override of the jury’s sentencing recommendation in a capital case’).
“The trial court’s sentencing order reflects the fact that the court gave ‘consideration to the recommendation of the jury in its advisory verdict that the defendant be sentenced to life without parole.’ R. 65. The court, however, after independently weighing the aggravating and mitigating circumstances, determined that the aggravating circumstance outweighed the mitigating circumstances and chose not to accept the jury’s recommendation. Constitutional and statutory provisions require no more.”
Carr v. State, 640 So.2d 1064, 1073-74 (Ala.Crim.App.1994). Moreover, as we stated in Sneed v. State, 1 So.3d 104 (Ala.Crim.App.2007):
“The appellant further contends that, in light of Ring [v. Arizona, 536 U.S. 584 (2002) ], Alabama’s standardless override results in the arbitrary application of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and the Equal Protection Clause. ‘The United States Supreme Court in Ring did not invalidate its earlier holding in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), which upheld § 13A-5-47(e), Ala.Code 1975 — commonly referred to as the judicial-override statute — against constitutional attack.’ Tomlin v. State, 909 So.2d 213, 282 (Ala.Crim.App.2002), rev’d on other grounds, 909 So.2d 283 (Ala.2003). Therefore, the appellant’s argument is without merit.”
1 So.3d at 143-44.
“The trial court’s sentencing order reflects the fact that the court gave ‘consideration to the recommendation of the jury in its advisory verdict that the defendant be sentenced to life without parole.’ R. 65. The court, however, after independently weighing the aggravating and mitigating circumstances, determined that the aggravating circumstance outweighed the mitigating circumstances and chose not to accept the jury’s recommendation. Constitutional and statutory provisions require no more.”
Carr, 640 So.2d at 1074. Doster is entitled to no relief on this claim.
XV.
Doster next argues that Alabama’s method of execution, lethal injection, constitutes cruel and unusual punishment.
*106 The Alabama Supreme Court recently addressed this issue and stated:
“The Eighth Amendment to the United States Constitution provides: ‘Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.’ ‘Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous, — something more than the mere extinguishment of life.’ In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). However, as the Supreme Court of the United States recently stated in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008):
“ ‘Our cases recognize that subjecting individuals to a risk of future harm— not simply actually inflicting pain— can qualify as cruel and unusual punishment. To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be “sure or very likely to cause serious illness and needless suffering,” and give rise to “sufficiently imminent dangers.” Helling v. McKinney, 509 U.S. 25, 33, 34-35 (1993) (emphasis added). We have explained that to prevail on such a claim there must be a “substantial risk of serious harm,” an “objectively intolerable risk of harm” that prevents prison officials from pleading that they were “objectively blameless for purposes of the Eighth Amendment.” Farmer v. Brennan 511 U.S. 825 842 846 and n. 9 (1994).’
“553 U.S. at 50, 128 S.Ct. at 1530-31.
“In Baze, two death-row inmates challenged Kentucky’s use of the three-drug protocol, arguing ‘that there is a significant risk that the procedures will not be properly followed — in particular, that the sodium thiopental will not be properly administered to achieve its intended effect — resulting in severe pain when the other chemicals are administered.’ 553 U.S. at 50, 128 S.Ct. at 1530. Beli-sle’s claim, like the claims made by the inmates in Baze, ‘hinges on the improper administration of the first drug, sodium thiopental.’ Baze, 553 U.S. at 53, 128 S.Ct. at 1533.
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze, 553 U.S. at 62, 128 S.Ct. at 1538, and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, 553 U.S. at 61, 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, 553 U.S. at 114, 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, 553 U.S. at 121, 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ‘Simply because an execution *107 method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze, 553 U.S. at 50, 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
Ex parte Belisle, 11 So.3d 323, 338-39 (Ala.2008). For the reasons set out by the Alabama Supreme Court in Belisle, Doster is due no relief on this claim.
XVI.
Doster next argues that he was denied his right to be present at sentencing because he was not in the courtroom when the circuit court issued its written sentencing order. Specifically, he argues: “Though the court imposed sentence in Mr. Doster’s presence, the court’s order, which contained findings of fact, conclusions of the court, and its ultimate judgment was issued after Mr. Doster was taken from the courtroom.” (Doster’s brief, at p. 86.)
Section 13A-5-47(d), Ala.Code 1975, provides:
“Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sen-tence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-51. The trial court shall also enter written findings of facts summarizing the crime and the defendant’s participation in it.”
Article I, § 6, Ala. Const, of 1901, provides, in pertinent part, that “in all criminal prosecutions, the accused has a right to be heard by himself and counsel, or either.” This right is incorporated into Rule 26.7, Ala. R.Crim. P., which states: “The defendant has the right to be present at the sentence hearing and at sentencing.” “Sentence” is defined in Rule 26.1, Ala. R.Crim. P., as “the pronouncement by the court of the penalty imposed upon the defendant after a judgment of guilty.” Doster was present when the circuit court orally pronounced his sentence in open court.
Moreover, § 13A-5-47(d), Ala.Code 1975, contains no provision that the circuit court’s formal sentencing order be read in the defendant’s presence. In fact, § 13A-5-47(d), specifically provides that the formal sentence order “shall be entered.” “Enter” denotes that the order should be filed with the appropriate official — the circuit clerk. Doster was not denied his right to be present at his sentence hearing.
XVII.
Doster argues that the circuit court erred in considering prior convictions set out in the presentence report without requiring the State to prove that he was represented by counsel when he was convicted of those prior charges. The presentence report showed that Doster had two prior felony convictions and eight prior misdemeanor convictions. The State did present evidence before trial indicating that Doster had been represented by counsel in the proceedings that resulted in the two prior felony convictions.
Initially, we note that Doster did not object; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
*108 Section 18A-5-47(b), Ala.Code 1975, specifically provides that a presentence-investigation report shall be prepared before sentencing. This statute states, in pertinent part:
“Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute.”
Section 15-22-51(a), Ala.Code 1975, provides:
“When directed by the court, a probation officer shall fully investigate and report to the court in writing the circumstances of the offense, criminal record, social history and present condition of a defendant.”
Rule 26.3(b), Ala. R.Crim. P., provides that a presentence report contain the following:
“(1) A statement of the offense and the circumstances surrounding it;
“(2) A statement of the defendant’s prior criminal and juvenile record, if any;
“(3) A statement of the defendant’s educational background;
“(4) A statement of the defendant’s employment background, financial condition, and military record, if any;
“(5) A statement of the defendant’s social history, including family relationships, marital status, interests, and activities, residence history, and religious affiliations;
“(6) A statement of the defendant’s medical and psychological history, if available;
“(7) Victim Impact Statements; and
“(8) Any other information required by the court.”
(Emphasis added.)
In Coral v. State, 628 So.2d 988 (Ala.Crim.App.1992), we discussed the admission of the contents of a presentence report and stated:
“ ‘Courts are permitted to consider hearsay testimony at sentencing.... While hearsay evidence may be considered in sentencing, due process requires both that the defendant be given an opportunity to refute it and that it bear minimal indicia of reliability....’ Kuenzel v. State, 577 So.2d 474, 528 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) (quoting United States v. Giltner, 889 F.2d 1004, 1007 (11th Cir.1989)). See also Smiley v. State, 435 So.2d 202 (Ala.Cr.App.1983).
“Section 13A-5-45 provides, in pertinent part, the following:
“ ‘(c) At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in sections 13A-5-49, 13A-5-51 and 13A-5-52....
“‘(d) Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements.... ’
*109 “These statutory provisions clearly provide for the admissibility of hearsay evidence during the sentencing stage of a capital defendant’s trial, so long as the defendant is given a fair opportunity to rebut it. The record in the instant case shows that the appellant was given ample opportunity to rebut the information contained in the presentence report and that he did object to portions of the report during the sentencing hearing. Thus, we find that the trial court could properly have considered the hearsay in the report.”
628 So.2d at 991-92.
“It is clear to this court that the [pre-sentence] report is entirely consistent with Alabama’s capital murder statute regarding evidence to be considered in sentencing. Section 13A-5-45(d), Code states, ‘[a]ny evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.’ Further, the report itself is an out-of-court statement and is entirely hearsay. However, it is admissible under § 13A-5^7 Code of Alabama, being specifically called for consideration by the trial court.”
Thompson v. State, 503 So.2d 871, 880 (Ala.Crim.App.1986). See Kuenzel v. State, 577 So.2d 474, 527 (Ala.Crim.App.1990) (“The inclusion of the defendant’s criminal history in the presentence investigative report was proper.”). See also United States v. Ramirez, 271 F.3d 611, 612 (5th Cir.2001) (“In making factual sentencing determinations, a presentence report is considered reliable and may be considered by the trial judge.”); State v. Grimes, 143 Ohio App.3d 86, 90, 757 N.E.2d 413, 416 (2001) (“In [State v.] Cook, [83 Ohio St.3d 404, 700 N.E.2d 570 (1998),] the Supreme Court held that ‘reliable hearsay, such as a presentence investigation report, may be relied on by the trial judge.’ ”); State v. Burdett, 134 Idaho 271, 275, 1 P.3d 299, 303 (Idaho Ct.App.2000) (“It is well settled that hearsay information believed to be reliable may be set forth in a presentence report, so long as the defendant is afforded an opportunity to present favorable evidence and to explain or rebut the adverse information.”); State v. Baker, 956 S.W.2d 8, 17 (Tenn.Crim.App.1997) (“[T]he Tennessee Criminal Sentencing Reform Act of 1989 contemplates that much of the information contained in a presentence report will be hearsay. However, the information is reliable because it is based upon the presen-tence officer’s research of the records, contact with relevant agencies, and the gathering of information which is required to be included in a presentence report.”). Compare United States v. Bennett, 472 F.3d 825, 833-34 (11th Cir.2006)(“[The defendant] failed to object to the facts of his prior convictions as contained in his PSI and addendum to the PSI despite several opportunities to do so; thus, he is deemed to have admitted those facts.”); United States v. Mueller, 902 F.2d 336, 346 (5th Cir.1990) (“As [the defendant] presented no relevant affidavits or evidence in rebuttal, the district court was certainly free to adopt the findings of the PSI [presentence investigation] without more specific inquiry or explanation.”).
“[Sentencing is different from trial, and the constitutional limitations placed on the latter do not apply to the former. Hearsay may be admitted at sentencing, even in death penalty cases, without violating the Constitution. See Roberts v. United States, 445 U.S. 552 (1980); Williams v. New York, 337 U.S. 241 *110 (1949). To implicate constitutional concerns, the evidence must amount to ‘misinformation.’ See United States v. Tucker, 404 U.S. 443, 446-47 (1972); Townsend v. Burke, 334 U.S. 736, 740-41 (1948). So long as the evidence is reliable and the defendant is provided notice and an opportunity to challenge its reliability, no constitutional violation results from the admission of hearsay at sentencing.”
Todd v. Schomig, 283 F.3d 842, 853 (7th Cir.2002).
Here, Doster was given a copy of the presentence report and the opportunity to challenge any inaccurate portions of that report. Doster made no objections to the now challenged presentence report. Nor does Doster argue on appeal that the criminal history as set out in the report was inaccurate or that he was not represented by counsel in the proceedings that resulted in any of his prior convictions detailed in the presentence report. The circuit court complied with the requirements of § 13A-5-47, Ala.Code 1975, by correctly considering the uncontested portions of the presen-tence report.
XVIII.
Doster next argues that the circuit court’s sentencing order contains errors.
A.
First, Doster argues that the circuit court erred in relying on a medical evaluation that was not admitted into evidence at Doster’s trial. Specifically, Dost-er asserts that it was error for the court to rely on a mental evaluation that had been completed by Dr. Karl Kirkland, a psychologist, before Doster was tried. Dr. Kirkland concluded that Doster was competent to stand trial.
In the circuit court’s sentencing order, the court stated the following in regard to the statutory mitigating circumstance that the “capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance”:
“Most telling to this Court, however, are two psychological evaluations conducted in connection with this trial. First, the Defendant was evaluated by Dr. Karl Kirkland, a clinical and forensic psychologist, on or about May 21, 2003, as ordered by this Court, to determine his competency to stand trial and sanity at the time of the crime. Dr. Kirkland saw the Defendant while he was incarcerated in the Alabama Department of Corrections. He noted in his report which is part of the court record of this matter that DOC psychologists had diagnosed the Defendant with personality disorder and major depression. Dr. Kirkland ultimately rendered a diagnosis of major depression, history of poly-drug dependence (heroin and amphetamines), history of marijuana abuse, and history of alcohol on Axis I, and mixed personality disorder with antisocial and borderline features on Axis II. Dr. Kirkland went on to find him competent to stand trial and, most importantly, opined that ‘[t]here is not a mental disorder present associated with the insanity defense’ and that the defendant ‘does not evidence nor report any symptoms of a mental disorder that would be associated with the inability to experience criminality and wrongfulness.’ He also noted that there is ‘no evidence to suggest psychosis or poor reality contact....’”
(C.R. 3388-89.)
After the circuit court issued its sentencing order, Doster objected to the court’s findings in this section of its sentencing order. In his motion, Doster asserted that the court should not have relied on a psy *111 chological report by Dr. Kirkland because the report had not been offered into evidence. (C.R. 3436.) In response to this motion, the circuit court issued the following order:
“If counsel for the defense has any evidence contradicting, impeaching, or in rebuttal to the report of Dr. Karl Kirkland as submitted to this Court during the Defendant’s competency hearing and as contained in the court file of this matter, counsel for the defense should be prepared to present it to this Court at the said hearing.”
(C.R. 3440.) At the hearing on this motion, the following occurred:
“[Prosecutor]: If you take Doctor Kirkland’s report and you read his findings and you take Doctor Van Rosen’s report and you read his findings and then you look at your order and look at how you relied up on Doctor Kirkland’s report, in just about the same breath, every time you mention Doctor Kirkland, you talk about how Doctor Van Rosen came to the same thing.
“Doctor Van Rosen is the one that [the defense] hired with the ex parte application and the funds and it’s Doctor Van Rosen’s report that was entered into evidence at the hearing before Your Honor.
[[Image here]]
“And, if you were to strike Doctor Kirkland from your order, you are still going to come out with the same thing.”
(R. 3050.) After the hearing, the circuit court issued the following order:
“If the Court initially erred in considering the psychological report prepared by Dr. Karl Kirkland, the Court essentially reopens that issue, and has now allowed the defense to bring on evidence ‘contradicting, impeaching or in rebuttal’ of the report this day. The Court has fully considered all defense information in that regard. After having done so,- the Court is of the opinion that, at this juncture, the report should not be excluded and that the report itself is now properly before it.”
(C.R. 3458.)
Section 13A-5-45(d), Ala.Code 1975, provides:
“Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama.”
The United States Supreme Court has stated the following concerning a sentencing hearing:
“[0]nce the guilt of the accused has been properly established, the sentencing judge, in determining the kind and extent of punishment to be imposed, is not restricted to evidence derived from the examination and cross-examination of witnesses in open court but may, consistently with the Due Process Clause of the Fourteenth Amendment, consider responsible unsworn or ‘out-of-court’ information relative to the circumstances of the crime and to the convicted person’s life and characteristics.”
Williams v. Oklahoma, 358 U.S. 576, 584, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959).
The circuit court complied with § 13A-5^45(d), Ala.Code 1975, by considering the contents of Dr. Kirkland’s report after giving Doster an opportunity to rebut the contents of that report. Moreover, the conclusions in Dr. Kirkland’s report were consistent with the conclusions reached by *112 defense expert Dr. C. Van Rosen. Citing Dr. Van Rosen’s report, the circuit court stated: “Dr. Van Rosen received a slightly different history from [Doster] but came to a diagnosis similar to that of Dr. Kirkland.” (C.R.3389.)
B.
Second, Doster argues that the circuit court erred in relying on what he says was inadmissible hearsay 'testimony that was presented at the sentencing hearing. Specifically, he asserts that the circuit court erred in relying on the hearsay statements of police officers concerning Doster’s codefendant’s statement to police. At the sentencing hearing before the court, the court allowed Scott Connor, an investigator with the district attorney’s office, to testify as to what Phillips told police about the shooting. Phillips said that Doster loaded the gun and gave it to him and that he shot LeMaster and that Doster had wanted to stab the victim. Also, the court allowed Elliot King, a former Covington County Sheriffs investigator, to testify about Doster’s second escape from the Covington County jail in April 2005 and the events subsequent to his escape. The record shows that counsel objected to the testimony concerning the codefendant’s statements and that the circuit court indicated that he would let them testify and that he would determine later whether he would consider the evidence. Also, in the circuit court’s sentencing order, the court stated the following after describing the above evidence: “The Court concludes, however, that the testimony in the preceding paragraph should be excluded, being too speculative in nature with respect to what Doster actually did or did not have to do with [a murder committed after Dost-er’s second escape in 2005].” (C.R. 3375.) The court also noted that it would not consider the contents of the codefendant’s statement to police when determining Doster’s sentence.
There is no indication that the circuit court relied on the contents of Phillips’s statement to Connor or King’s testimony when sentencing Doster to death.
XIX.
Doster next argues that the circuit court erred in overriding the jury’s unanimous recommendation of life imprisonment without the possibility of parole and sentencing Doster to death. Specifically, Doster argues that in overriding the jury’s unanimous recommendation, the circuit court failed to comply with the Supreme Court’s decisions in Ex parte Carroll, 852 So.2d 833 (Ala.2002), and Ex parte Tomlin, 909 So.2d 283 (Ala.2003), because, he argues, the court failed to give due consideration to the fact that Doster was not the trigger-man, failed to consider the strength of the unanimous recommendation by the jury, erroneously considered that Doster’s record was relevant to his future dangerousness, and relied on erroneous factors to override the jury’s recommendation.
Section 13A-5-47(e), Ala.Code 1975, commonly referred to as Alabama’s judicial-override statute, states:
“In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5-46(a) or Section 13A-5-46(g). While the jury’s recommendation concerning sentence shall be given consideration, it is not binding upon the court.”
In Ex parte Taylor, 808 So.2d 1215 (Ala.2001), the Alabama Supreme Court first held that when a circuit court override’s a *113 jury’s recommendation of life imprisonment without the possibility of parole, the court must set out specific reasons for giving the jury’s recommendation the consideration that it gave it.
In Ex parte Carroll, the Supreme Court reviewed a judicial override of a 10 to 2 jury’s recommendation of life imprisonment without the possibility of parole. The Supreme Court found that Carroll’s lack of a significant criminal history, the recommendation by the victim’s family to spare Carroll’s life, and the jury’s 10 to 2 recommendation “tip[ped] the scales in favor” of a sentence of life imprisonment. The Supreme Court stated the following concerning § 13A-5-47(e), Ala.Code 1975:
“We take this opportunity to further explain the effect of a jury’s recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the ‘triggerman’ or a recommendation of leniency by the victim’s family; the jury’s recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.
[[Image here]]
“ ‘Given the jury’s recommendation of life imprisonment without parole; the recommendation of the victim’s family that the defendant be sentenced to life imprisonment without parole; the fact that the defendant was 17 years old when he committed the crime; and the circumstances of the crime (particularly that the defendant made no attempt to kill the witnesses to the crime), ... the sentence of death is excessive and disproportionate.’
“[Ex parte Carroll,] 852 So.2d [821] at 828 [ (Ala.2001) ] (Houston, J., concurring in part and dissenting in part). Because of Carroll’s age at the time of the offense, his lack of a significant criminal history, and the recommendation of the victim’s family that he be sentenced to life imprisonment without parole, the jury’s 10-2 recommendation that he not be sentenced to death tips the scales in favor of following the jury’s recommendation. We therefore reverse the judgment of the Court of Criminal Appeals as to Carroll’s sentence and remand the case for that court to instruct the trial court to resentence Carroll following the jury’s recommendation of life imprisonment without the possibility of parole.”
852 So.2d at 836-37.
In Ex parte Tomlin, the jury unanimously recommended that Tomlin be sentenced to life imprisonment; the court’s only explanation for overriding its recommendation was that Tomlin’s codefendant had been convicted of capital murder and sentenced to death. The Alabama Supreme stated:
“ ‘[T]he death penalty should be carried out only after this Court has found it appropriate to do so by independently weighing the aggravating and mitigating circumstances.’ Ex parte Hays, 518 So.2d 768, 780 (Ala.1986) (opinion on rehearing). Therefore, while the trial court, acting without the guidance offered by Carroll, gave ‘serious consideration to the unanimous recommendation of the jury for life [imprisonment] without parole,’ we are compelled to treat *114 the jury’s recommendation as a mitigating circumstance. Indeed, we must give that mitigating circumstance great weight.
“ ‘The weight to be given [a jury’s recommendation of life imprisonment without the possibility of parole] should depend upon the number of jurors recommending a sentence of life imprisonment without parole.’ [Ex parte] Carroll, 852 So.2d [833] at 836 [ (Ala.2002) ]. In Carroll, we found that a jury’s 10-2 vote for a sentence of life imprisonment without the possibility of parole demonstrated ‘overwhelming support’ of such a sentence. 852 So.2d at 837. Therefore, it is only logical to conclude that a unanimous recommendation like the one here provides even more ‘overwhelming support’ of such a sentence and, therefore, must be afforded great weight.
[[Image here]]
“ ‘[T]he jury’s recommendation [of life imprisonment without the possibility of parole] may be overridden based upon information known only to the trial coui't and not to the jury, when such information can properly be used to undermine a mitigating circumstance.’ Carroll, 852 So.2d at 836. Here, the trial court overrode the jury’s recommendation, because ‘[t]he other perpetrator in this crime, John Ronald Daniels, was convicted of the capital offense of first degree murder of the same two people and [was] sentenced to death.’ Although the jury was not aware of Daniels’s sentence, his sentence cannot properly be used to undermine a mitigating circumstance.”
909 So.2d at 286-87.
In order to address Doster’s issues regarding the judicial override of the jury’s recommendation, we quote extensively from the circuit court’s thorough sentencing order. In choosing to override the jury’s recommendation and sentence Dosier to death, the court stated:
“[T]he jury, following the sentencing phase of the trial, returned a 12-0 verdict recommending that the defendant be sentenced to life imprisonment without parole. Although such a verdict is advisory for this Court and not controlling, the Alabama Supreme Court has mandated the following:
“ ‘Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend on the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence of the identity of the “trig-german” or a recommendation of leniency by the victim’s family; the jury’s recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.’
“Ex parte Carroll, 852 So.2d 833 (Ala.2002).
“In any event, there are factors that distinguish this case from those that arose in Carroll. For instance, the victim’s family in this case has not recommended leniency. Though a family member did not testify at sentencing, the victim’s girlfriend did testify at the initial sentencing phase and did anything but recommend leniency for [Doster]. There is also no dispute here that [Dost-er], though not the triggerman, played a major role in the victim’s death. There are also additional factors that posture this case in such a fashion that judicial *115 override would not conflict with the mandates of Carroll.
“First of all, this Court, in compliance with Carroll, gives the jury’s recommendation its proper weight according to the Carroll line of cases, fully recognizing the importance of this non-statutory mitigating circumstance, especially given the number of jurors recommending life without parole. Such a vote often ‘tips the scales in favor of following the jury’s recommendation.’ 852 So.2d at 837. That fact, however, does not prohibit this Court from overriding the jury’s verdict, even if unanimous, in an appropriate case. See, e.g., Ex parte Jackson, 836 So.2d 979 (Ala.2002), cert. denied, 537 U.S. 1031 (2002) (detailed opinion overriding jury’s 12-0 recommendation of life without parole affirmed). In other words, it is still this Court’s duty, ultimately, to consider how the aggravating circumstances and the mitigating circumstances ‘shake out’ when considered together.
“Initially, therefore, this Court makes two points absolutely clear: (1) there are factors in this case that the jury was not privy to in reaching its verdict; and (2) there are factors that this Court believes ‘could have affected “the strength of the factual basis” for the jury’s recommendation that [the defendant] be sentenced to life imprisonment without parole.... ” Martin v. State, 931 So.2d 774 (Ala.Crim.App.2005).
“a) Factors not known to the jury
“There are several factors that the jury did not have before it that this Court feels would have impacted their verdict. First and foremost, the jury did not have before it the extent of [the defendant’s] prior criminal history. As the trial court in Martin noted:
“ ‘... this Court had the benefit of reviewing a pre-sentence report before sentencing Martin to death. The jury is in no position to ask for a pre-sentence report to be prepared for [it] prior to fixing [its] recommended punishment. It may well be stretching credulity to assume that a jury, composed of jurors who may be hearing their first criminal case, is in a position to properly weigh the aggravating [circumstances] and mitigating circumstances in arriving at [its] ultimate recommendation.’
“931 So.2d at 781-82. This Court has previously commented on the lengthy criminal history that [Doster] possessed. Had the jury been privy to this information, and had they been able to deal with it fairly and without undue prejudice to [Doster], it is highly likely that there would have been greater weight placed on the three aggravating circumstances that were found by the jury. For example, the jury may well have reacted differently in the sentencing phase had they known that Doster was incarcerated for child sexual abuse when he first escaped, because, as stated earlier, such a conviction recognizes a serious risk of recidivism and the need for life-long registration. It may well be that such things would have mattered to the jury, and, likewise, the jury may well have reacted differently in the sentencing phase if they had known Doster had previously committed other crimes of violence and other property crimes.
“Doster’s criminal history would likewise tend to decrease the weight the jury may have placed on the mitigating factor of the defendant’s alcohol and substance abuse problems, and on the mitigating factor of his troubled youth. Without knowledge of his criminal history, one might be led to believe that his history of substance abuse and other *116 problems led him down a truly uncharacteristic path that culminated in criminal behavior in this case. Yet, in examining his criminal history, one sees a man who, substance abuse problems or not, persists in behaving criminally.
“Additionally, the jury did not have before it the fact that [Doster] escaped from the Covington County jail on a subsequent occasion and that he had pleaded guilty to this offense. A large part of the defense’s testimony at the sentencing hearing before the jury involved the defendant’s love for his children. This was very emotional testimony. Similarly, the jury heard tapes during the trial of interviews with the defendant during which he would cry when he discussed his love for his boys. To the contrary, the testimony of Chief Deputy Walter Inabinett at the third phase of this trial relating statements made by [Doster] regarding the 2005 escape indicates that [Doster] had no intentions of returning to his children or rendering any future support for them. [Doster], at that time, as he did in the underlying case, simply escaped from custody and ultimately left the state with the intent of never returning.
“Finally, the jury did not have before it evidence of [Doster’s] future dangerousness. As argued by the State at the sentencing phase before this Court, future dangerousness is a proper consideration in a capital sentencing scheme. Indeed, future dangerousness is ‘a subject of inestimable concern at the penalty phase of a capital trial.’ McGriff v. State, 908 So.2d 961, 1013 (Ala.Crim.App.2001), rev’d on other grounds, 908 So.2d 1024. Evidence of a defendant’s ‘future dangerousness’ is a ‘valid sentencing factor’ in a capital case and is thus ‘relevant and admissible at the penalty phase of the capital trial.’ Supra at 1014. See also, Arthur v. State, 575 So.2d 1165 (Ala.Crim.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991).
“Evidence of such future dangerousness is exhibited in [Doster’s] criminal history as contained in the pre-sentence report, his behavior in the underlying cause, and in his subsequent escape. This Court firmly believes that the defendant continues to be a serious escape risk, even now. In the underlying case, he killed in order to stay free. He ought not have the opportunity to go to that extreme again, especially in light of his conviction in this matter. This Court believes that, had the jury been privy to all the information relating to future dangerousness, it would have impacted their decision making.
“The foregoing militates against allowing the great weight of the jury’s mitigating verdict to overcome the three very real aggravating factors that exist in this proceeding. Indeed, had all the above facts been known to the jury at the time of their deliberations as to sentence, it would have likely increased the weight that they themselves placed on the aggravating circumstances and decreased the weight that they placed on the mitigating circumstances.
“b) Additional factors affecting the strength of the factual basis for the jury’s recommendation
“There are also additional factors that should be taken into consideration in giving the jury’s recommendation its proper weight specifically the jury’s emotionalism and the brevity of their deliberations. When the verdict was read in open court following the guilt phase of the trial, [Doster’s] family became visibly emotional. Simultaneously, this Court observed several jurors become emotional as well in reaction to the impact of the guilty verdict. As required by § 13A-5-45(a), the sentencing *117 phase before the jury was conducted ‘as soon as practicable after [Doster] [was] convicted.’ Thus, after a short recess, the Court required the parties to proceed with arguments and evidence pertaining to sentence. During such hearing, the defense put [Doster’s] mother on the stand who was so emotional that she had difficulty speaking. During the course of her testimony, she asked the jury to spare her son’s life. Following closing arguments, the jury deliberated for only a few minutes before returning their verdict.
“In Ex parte Taylor, 808 So.2d 1215 (Ala.2001), cert. denied, 534 U.S. 1086 (2002), the Alabama Supreme Court upheld a trial judge’s override of a jury’s recommendation of life imprisonment without parole. In that case, the trial judge noted the following:
“ ‘[W]hile the jurors in this case, were cooperative, harmonious, diligent, and attentive, some jurors’ outbursts of emotion after they found the defendant guilty of capital murder indicated that they were overwhelmed by their impending duty to consider the death penalty as required by law.’
“808 So.2d at 1219. This Court has observed much the same in this matter.
“Based on these things, this Court finds that the jury’s verdict was overly impacted by the emotionalism present in the courtroom environment during the sentencing hearing. The brevity of their deliberation in the face of three strong aggravating circumstances, the nonexistence of any statutory mitigating circumstances, and the weakness of the various nonstatutory mitigating circumstances (other than the jury verdict itself) lead this Court to view the jury verdict favoring life [imprisonment] without parole as not absolutely controlling. The Court further finds that, in the weighing of this case, it should not accept the jury recommendation.
“In summary, this Court has found that three aggravating circumstances were established by the evidence, beyond a reasonable doubt. Those have been compared to and weighed against: the absence of any statutory mitigating circumstances; and the existence of seven nonstatutory mitigating circumstances (including the jury’s unanimous verdict recommending that the defendant be sentenced to life imprisonment without parole). Each aggravating circumstance and mitigating circumstance is discussed at length in the previous pages and will not be reiterated here, except to add that, in the judgment of this Court, none of the mitigating circumstances, individually or collectively, are entitled to substantial weight, especially when considered in relation to the nature of this crime, with the exception of one: the jury’s verdict and vote count. Regardless, this Court finds that even the strong weight that should be so given to that mitigating factor has been overcome, for various reasons, as set out previously.
“Accordingly, after careful and deliberate consideration of all circumstances, this Court is convinced beyond a reasonable doubt that the aggravating circumstances substantially overbear the mitigating circumstances, including the jury verdict. This conclusion is based on all the prior content and reasoning of this entire decision, as set forth in the preceding pages.
“This Court does not relish its role of having to overrule the jury’s verdict, but it is a responsibility placed on the Court by Alabama law. As stated in Harris v. Alabama, 513 U.S. 504 (1995):
*118 “‘The Constitution permits the trial' judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury’s recommendation and trusts the judge to give it the proper weight.’
“513 U.S. at 515. The Alabama Legislature, in enacting the capital murder statutes, has taken this position and has put the burden of making this decision on the shoulders of this Court. As another trial judge once noted and as the Alabama Court of Criminal Appeals has quoted:
“ ‘This Court has no doubt that juries conscientiously attempt to balance [the aggravating and mitigating circumstances], but it was recognized by the Legislature from the beginning that this final decision should be in the hands of an experienced jurist and not a jury who may be sitting for the first time.’
“Martin v. State, 931 So.2d 774, 781-82 (Ala.Crim.App.2005), cert. denied, 547 U.S. 1208, 126 S.Ct. 2890, 165 L.Ed.2d 921 (2006). This judge has sworn an oath to uphold the law of this State, and this is a duty the Court does not take lightly.
“The United States Supreme Court has recognized that ‘certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.’ Gregg v. Georgia, 428 U.S. 153 (1976). The undersigned notes that multiple defendants have been sentenced to death for committing only one of the capital offenses that this defendant has been convicted of. See, e.g., Hodges v. State, 856 So.2d 875 (Ala.Crim.App.2001), aff'd, 856 So.2d 936 (2003), cert. denied, 540 U.S. 986 (2003) (intentional murder committed during a robbery); James v. State, 788 So.2d 185 (Ala.Crim.App.2000), cert. denied, 532 U.S. 1040 (2001) (intentional murder committed during a burglary); Hardy v. State, 804 So.2d 247 (Ala.Crim.App.1999), aff'd, 804 So.2d 298 (Ala.2000), cert. denied, 534 U.S. 1043 (2001) (intentional murder committed during a robbery); Neal v. State, 731 So.2d 609 (Ala.Crim.App.1997), aff'd, 731 So.2d 621 (Ala.), cert. denied, 527 U.S. 1027 (1999) (murder committed during a burglary). Comparisons to such cases indicate that death is the appropriate sentence herein, and that same is not disproportionate or excessive.
“In the judgment of this Court, it has ample justification to override the jury’s verdict and hereby does so.”
(C.R. 3401-10.)
A.
First, Doster argues that the circuit court failed to give due consideration to the fact that Doster was not the trigger-man. In the circuit court’s sentencing order, the court found that Doster’s role as the nontriggerman was a nonstatutory mitigating circumstance, and the court gave this circumstance little weight. (C.R. 3401.)
We have repeatedly held that a non-triggerman may be convicted of capital murder and sentenced to death. See Killingsworth v. State, [Ms. CR-06-0854, November 13, 2009] — So.3d - (Ala.Crim.App.2009); Sneed v. State, 1 So.3d 104 (Ala.Crim.App.2007); Gamble v. State, 791 So.2d 409 (Ala.Crim.App.2000); Haney v. State, 603 So.2d 368 (Ala.Crim.App. *119 1991); Womack v. State, 435 So.2d 754 (Ala.Crim.App.1983).
Here, the circuit court made detailed findings concerning Doster’s participation in the murder, and it found that Doster’s participation was not minor even though he was not the triggerman. “Of course, the weight to attach to this non-statutory mitigating circumstance is within the discretion of the trial court.” Hodges v. State, 856 So.2d 875, 893 (Ala.Crim.App.2001).
B.
Second, Doster asserts that the court failed to give the jury’s unanimous verdict sufficient weight.
The court found that the jury’s advisory verdict was a nonstatutory mitigating circumstance that was entitled to great weight. It is clear upon reading the sentencing order that the circuit court scrupulously complied with the Supreme Court’s directions in Ex parte Carroll and Ex parte Tomlin.
The Alabama Supreme Court has not held that a circuit court may never override a unanimous jury recommendation of life imprisonment without the possibility of parole. In fact, in Ex parte Jackson, 836 So.2d 979 (Ala.2002), the Supreme Court upheld a judicial override of a jury’s unanimous recommendation for life imprisonment without the possibility of parole and stated:
“In this case, before determining the sentence, the trial court considered all the available evidence; heard arguments on aggravating circumstances and mitigating circumstances; entered written findings of fact summarizing the offense and Jackson’s participation in it; made specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstance offered pursuant to § 13A-5-52; weighed the advisory verdict of the jury; considered and weighed the presen-tence-investigation report; considered and independently weighed the mitigating circumstances and the aggravating circumstances; and stated specific reasons for giving the jury’s recommendation the consideration it gave the recommendation, see Ex parte Taylor[, 808 So.2d 1215 (Ala.2001) ]. After following this procedure, the trial court concluded that the aggravating circumstances outweighed the mitigating circumstance and imposed the death penalty, overriding the jury’s recommendation.
“We commend the trial court for its thorough sentencing order and especially for its explanation for its override of the jury recommendation. The trial court found two statutory aggravating circumstances: (1) that the capital offense was committed while Jackson was engaged in a robbery or an attempted robbery, and (2) that the capital offense was committed by a person under sentence of imprisonment. The trial court found one statutory mitigating circumstance: that Jackson was 18 years old at the time of the offense. It is evident from the trial court’s sentencing order that it independently weighed the aggravating circumstances and the mitigating circumstance. Additionally, the trial court provided a detailed analysis of its consideration of the jury’s recommendation of a sentence of life imprisonment without the possibility of parole and the reasons it rejected that recommendation and sentenced Jackson to death. There is no evidence in the record before us indicating that bias, passion, or prejudice were factors in the trial court’s imposing the death sentence”
836 So.2d at 990.
Here, the circuit court properly found that the jury’s recommendation of life im *120 prisonment without the possibility of parole was a mitigating circumstance that, based on the fact that the recommendation was unanimous was entitled to great weight. The court stated that it felt compelled to override the jury’s recommendation based on evidence that the jury was not privy to in reaching its recommendation. First, the circuit court noted that the court had access to Doster’s extensive criminal record.[14] The court then noted that the jury was never informed what offense that Doster was convicted of and was serving his sentence for when he escaped from the Covington County jail, nor was the jury informed that Doster escaped a second time in 2005. The court then found that the jury was very emotional during sentencing, that Doster’s mother cried when she testified, that the court noticed that jurors were visibly upset, and that the jurors deliberated for only a few minutes after Doster’s mother begged them to spare her son’s life.
After reviewing the circuit court’s very thorough order, it is clear that the circuit court meticulously complied with Alabama Supreme Court law when overriding the jury’s recommendation. Our review of the record also convinces this Court that although Doster was not the man who fired the fatal shot he was a major participant in the events leading to LeMaster’s death and even led Phillips to the site of the murder. The circuit court’s conclusions and findings negated the application of the mitigating circumstances that Doster had no significant history of prior criminal activity and that Doster was an accomplice and that his participation was relatively minor— §§ 13A-5-51(l) and 13A-5-51(4), Ala.Code 1975. The Supreme Court has held that these are valid considerations when overriding a jury’s recommendation of life imprisonment without the possibility of parole. See Tomlin. Also, we are not presented with a situation like Carroll where the court overrode a jury’s 10-2 recommendation for life imprisonment and the defendant had no significant criminal history and the victim’s family requested leniency. Nor is this case similar to the facts presented in Tomlin where the circuit court’s only explanation for overriding the jury’s unanimous recommendation for life imprisonment was that the defendant’s codefendant had been sentenced to death. “We commend the trial court for its thorough sentencing order and especially for its explanation for its override of the jury recommendation,” Jackson, 836 So.2d at 990, and find no valid legal basis to disturb the court’s override of the jury’s recommendation in this case.
C.
Doster next asserts that the circuit court erred in finding that his criminal history was relevant to his future dangerousness.
However, in McGriff v. State, 908 So.2d 961 (Ala.Crim.App.2000), rev’d on other grounds, 908 So.2d 1024 (Ala.2004), we noted that evidence indicating future dangerousness was relevant and admissible in *121 Alabama pursuant to § 13A-5-45(d), Ala. Code 1975. This section states:
“Any evidence which has probative value and is relevant to sentence shall be received at the sentencing hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama.”
See Simmons v. South Carolina, 512 U.S. 154, 162, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (“This Court has approved the jury’s consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant’s future dangerousness bears on all sentencing determinations made in our criminal justice system.”). The circuit court correctly considered Doster’s future dangerousness.
D.
Doster next argues that the court erred in stating that the jury’s emotionalism and its brevity in reaching a verdict in the penalty phase were valid considerations.
However, the Alabama Supreme Court in Ex parte Taylor, specifically held that it is a valid consideration to consider the emotionalism of the jury when overriding a jury’s recommendation. 808 So.2d at 1219.
XX.
Last, as required by § 13A-5-53, Ala.Code 1975, we address the propriety of Doster’s capital-murder conviction and sentence of death.
Doster was convicted of murdering Le-Master during the course of a robbery, see § 13A-5-40(a)(2), Ala.Code 1975; during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975; and by shooting LeMaster while LeMaster was inside a dwelling, see § 13A-5^40(a)(16), Ala.Code 1975.
The record shows that Doster’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
The circuit court found that the aggravating circumstances outweighed the mitigating circumstances. The court found three aggravating circumstances. First, the court found that the murder was committed while Doster was under a sentence of imprisonment for his conviction for sexual abuse in the first degree, § 13A-5-49(1), Ala.Code 1975. Second, the court found that the murder was committed during the course of a robbery, § 13A-5-49(4), Ala.Code 1975. Third, the court found that the murder was committed during the course of a burglary, § 13A-5-49(4), Ala.Code 1975.[15]
The court found no statutory mitigating circumstances. In accordance with § 13A-5-52, Ala.Code 1975, the court found the following nonstatutory mitigating circumstances: that Doster had a history of substance abuse and addiction, that Doster had mental-health issues that included his struggle with depression and his antisocial behavior, that Doster had had a troubled youth, that Doster was willing to take responsibility for his property crimes, that Doster was a good father to his two young boys, that Doster was not the triggerman, and that the jury’s ad *122 visory recommendation was life imprisonment without the possibility of parole. The circuit court weighed the aggravating circumstances against the mitigating circumstances and determined that the aggravating circumstances outweighed the mitigating circumstances and sentenced Doster to death.
Section 13A-5-53(b)(2), Ala.Code 1975, requires that this Court independently weigh the aggravating and the mitigating circumstances. After an independent weighing we agree that the death penalty was the appropriate sentence in this case. See § 13A-5-53(b)(2), Ala.Code 1975.
Section 13A-5-53(b)(3), Ala.Code 1975, requires that we determine whether Doster’s sentence is disproportionate or excessive to penalties imposed in similar cases. Doster’s sentence is neither. “In fact, two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder.” McWhorter v. State, 781 So.2d 257, 330 (Ala.Crim.App.1999). See also Walker v. State, 932 So.2d 140 (Ala.Crim.App.2004) (burglary/murder).
Finally, as required by Rule 45A, Ala. RApp. P., we have searched the record for any error that may have adversely affected Doster’s substantial rights and have found none.
For the foregoing reasons, Doster’s convictions for capital murder and his sentences of death are due to be, and are hereby, affirmed.
AFFIRMED.
WELCH, WINDOM, and KELLUM, JJ., concur. MAIN, J., concurs in the result.

. The indictment charging Doster contained 23 different counts. He pleaded guilty to 17 counts related to his escape and his subsequent commission of several burglaries. The district attorney dismissed three other counts before the case was submitted to the jury.

. Phillips was also convicted of capital murder for killing LeMaster during the course of committing a burglary and a robbery and for killing LeMaster by firing at LeMaster while he was inside a dwelling. Phillips was sentenced to death. We affirmed Phillips’s conviction and sentence of death on direct appeal. See Phillips v. State, 65 So.3d 971 (Ala.Crim.App.2010).

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. To protect the anonymity of the jurors, we are using their initials.

. Here, the circuit court asked the State to give its reasons for removing the black prospective jurors; thus, we will examine the prosecutor’s reasons to determine if they are race-neutral. " ‘When a trial court calls upon the prosecutor for an explanation, without expressly finding a prima facie case, we will proceed directly to evaluate the sufficiency of the ensuing explanation. Williams v. State, 548 So.2d 501, 504 (Ala.Cr.App.1988)."’ Fletcher v. State, 703 So.2d 432, 435 (Ala.Crim.App.1997).

. Doster moved that juror questionnaires be used in the case; however, the circuit court denied this motion. (CR.866)

. Recently, the United States Supreme Court considered whether the United States Court of Appeals for the Fifth Circuit erred in reversing a defendant’s capital-murder conviction after finding that a demeanor-based peremptory strike could not be used to justify a strike unless the judge personally observed and recalled the challenged juror's demeanor. The Supreme Court stated:
*76 "[W]here the explanation for a peremptory challenge is based on a prospective juror's demeanor, the judge should take into account, among other things, any observations of the juror that the judge was able to make during the voir dire. But Batson plainly did not go further and hold that a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor.”
Thaler v. Haynes, - U.S. -, -, 130 S.Ct. 1171, 1174, 175 L.Ed.2d 1003 (2010).

. Doster gave two statements to Sgt. Long, one on November 18 and one on November 21. In the November 18 statement Doster denied any involvement in LeMaster’s murder or the burglaries.

. We addressed a similar issue in Phillips v. State, and found no error. 65 So.3d at 994.

. The court may permit amendment at any time before verdict "if no additional or different offense is charged and if the substantial rights of the defendant are not prejudiced.” Rule 13.5(a), Ala. R.Crim. P.

. This statute was amended effective September 1, 2003, to raise the amount from $1,000 to $2,500 and to insert "or she” in two places in subsection (a).

. Section 12-16-13, Ala.Code 1975, which was in effect until Rule 14, Ala. R.Crim. P. Temp., now 21.1, Ala. R.Crim. P., was amended effective January 1, 1991. That section provided, in pertinent part: "Charges which are marked 'given' by the trial court judge must be taken by the jury with them on retirement, and those ‘refused’ must be retained by the clerk.”

. Doster also attacks the Supreme Court's decision in Ex parte Waldrop. However, this Court is bound by the decisions of the Alabama Supreme Court and has no authority to reverse or modify those decisions. See § 12— 3-16, Ala. Code 1975.

. Doster had prior felony convictions for sexual abuse in the first degree and for receiving stolen property in the first degree. He had prior misdemeanor convictions for harassment, menacing, disorderly conduct, driving under the influence, criminal mischief, assault in the third degree, and criminal trespass which, the court said, spanned an eight-year period. The court also noted that it could consider the 16 convictions connected to this case because he was convicted and sentenced for those convictions before the sentencing hearing in this case. See Ex parte McWilliams, 640 So.2d 1015, 1023 (Ala.1993) (" ‘As used in sections 13A-5-49(2) [aggravating circumstances] and 13A — 5—51(1) [mitigating circumstances], these terms refer to events occurring before the date of the sentence hearing.’ ").

. This Court has held that: “If the actions committed during the course of the murder support the finding that more than one of the enumerated underlying felonies was committed, then a trial court may apply § 13A-5-49(4) more than once.” Hodges v. State, 856 So.2d 875, 889 (Ala.Crim.App.2001).